IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
January 24, 2013 Session

## STACEY MITCHELL and BRYAN MITCHELL, For themselves, and as next friend to Lauren Mitchell, a minor v. THE JACKSON CLINIC, P.A., ET AL.

Direct Appeal from the Circuit Court for Madison County
No. C-07-294      Roy B. Morgan, Jr., Judge

No. W2012-00983-COA-R3-CV - Filed April 9, 2013

This is a medical malpractice case. The trial court granted summary judgment to Appellees, the doctors and clinic, on the basis that the Appellants' only expert witness was not competent to testify pursuant to the Tennessee Medical Malpractice Act, Tennessee Code Annotated Section 29–26–115. Appellants appeal, arguing that the trial court erred in excluding their expert. Under the Tennessee Supreme Court's holding in ***Shipley v. Williams***, 350 S.W.3d 527 (Tenn. 2011), we affirm the trial court's exclusion of the expert's testimony and its grant of summary judgment. Affirmed and remanded.[1]

**Tenn. R. App. P. 3. Appeal as of Right; Judgment of the Circuit Court Affirmed and Remanded**

J. STEVEN STAFFORD, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J.,W.S., and HOLLY M. KIRBY, J., joined.

William E. Bruce, Memphis, Tennessee, for the appellants, Stacey Mitchell and Bryan S. Mitchell, for themselves, and next friend to Lauren Mitchell, a minor.

James E. Looper, Jr., Nashville, Tennessee, for the appellees, The Jackson Clinic, P.A., William H. Woods, M.D. and James A. Payne, M.D.

**OPINION**

---

[1] This case was assigned to Judge Stafford on March 8, 2013.

Lauren Mitchell was born on April 26, 2003 at the Jackson Madison County General Hospital. Lauren's parents are Stacey Mitchell and Bryan S. Mitchell (the "Mitchells," or "Appellants"). Dr. William H. Woods and Dr. James A. Payne are board certified pediatricians, practicing in Jackson Tennessee at the Jackson Clinic, P.A. (together with Drs. Woods and Payne, "Appellees").

On September 7, 2007, Appellants, individually and as next friend of Lauren Mitchell, filed suit against the Appellees, claiming, in relevant part, that Drs. Payne and Woods were negligent in: (1) failing to order or perform additional tests to determine the cause of Lauren's hyperbilirubinemia;[2] (2) failing to treat Lauren's jaundice; (3) failing to inform the Mitchells about Lauren's condition; and (4) failing to refer Lauren for further tests for bilirubin levels following her hospitalization.[3] The complaint alleges that Appellees' actions caused Lauren to suffer permanent encephalopathy from elevated bilirubin levels.[4] The relevant factual averments in the complaint are that, on April 26, 2003, Lauren's nurses

---

[2] Hyperbilirubinemia is a condition in which there is too much bilirubin in the blood. When red blood cells break down, a substance called bilirubin is formed. Babies are not easily able to metabolize the bilirubin and it can build up in the blood and other tissues and fluids of the baby's body. This is called hyperbilirubinemia. Because bilirubin has a pigment or coloring, it causes a yellowing of the baby's skin and tissues. This is called jaundice.

[3] We note that the complaint also names several other doctors and the hospital as party-defendants, alleging negligence in the prenatal treatment provided to Mrs. Mitchell. These other defendants were dismissed during the pendency of the case and the sole Appellees in this appeal are Dr. Woods, Dr. Payne, and The Jackson Clinic, P.A. Despite this fact, we note that the appellate record contains numerous filings that relate solely to Appellants' case against the dismissed defendants, and also includes extraneous discovery materials that are specifically excluded from appellate records under Tenn. R. App. 24(a). The problem with including extraneous filings in the record is that it places upon this Court a duty that falls to the Appellant—to prepare a correct and complete record on appeal. Tenn. R. App. P. 24(b). In making that record, the Appellant should, of course, adhere to the mandates contained in Tennessee Rule of Appellate Procedure 24(a), but should also endeavor to tailor the record to include only the filings that are necessary based upon the parties to the appeal and the issues specific to those parties. It is too often the case that appellants simply include every filing made in the trial court in the appellate record. This practice is not in keeping with the spirit of the Rules of Appellate Procedure and the role of the appellant in that process. This Court endeavors to file its opinions in a timely manner; however, when placed in the position of having to review volumes of extraneous, unnecessary, and irrelevant filings, our goal is hindered and the interests of judicial economy are stymied.

[4] Bilirubin is toxic to cells of the brain. If a baby has severe jaundice, there's a risk of bilirubin passing into the brain, a condition called acute bilirubin encephalopathy. Prompt treatment may prevent significant permanent damage to the brain caused by bilirubin encephalopathy.

observed that she was jaundiced. Dr. Payne investigated the report of jaundice on April 27, 2003, by ordering blood drawn for a total bilirubin count. On April 27, Lauren's bilirubin count was 10.1. On April 28, 2003, Dr. Woods assumed responsibility for Lauren's care, and ordered a second bilirubin level blood test. According to the complaint, the April 28th blood work revealed that Lauren's bilirubin level had risen to 12.3. Without further examination, the complaint avers that Dr. Woods discharged Lauren from the hospital, while she was still jaundiced. The record indicates that an infant's bilirubin level normally peaks at approximately seventy-two hours after birth. Consequently, the alleged standard of care requires that infants, presenting with jaundice, should have bilirubin tests at least every twenty-four hours until the levels trend downward. Because Lauren's bilirubin level was, in fact, rising when she was discharged by Dr. Woods (at about fifty-six hours post delivery), the Appellants argue that the care provided to Lauren was below the applicable standard of care.

The parties filed cross-motions for summary judgment. In support of their motion for summary judgment, the Mitchells relied upon the affidavit testimony of Dr. Stephen L. Winbery. On March 31, 2011, the Mitchells filed a designation of expert, indicating that Dr. Winbery was expected to testify on Appellants' behalf. In relevant part, the designation indicates that Dr. Winbery was expected to testify concerning: (1) jaundice; (2) pathological jaundice; (3) cephalohematoma; (4) bilirubin metabolism; (5) bilirubin encephalopathy; and (6) the American Academy of Pediatrics' Guidelines for jaundice. Dr. Winbery's curriculum vitae was filed concurrent with the designation. On February 2, 2012, Appellees filed a motion to strike Dr. Winbery as an expert, and for entry of summary judgment in their favor. The motion to strike Dr. Winbery's testimony was incorporated, by reference, into a motion *in limine*, which was filed by Appellees on March 5, 2012. Appellants opposed all of Appellees' motions that were related to the exclusion of Dr. Winbery's testimony and summary judgment.

All pending pre-trial motions were heard on March 19, 2012. By Order of April 12, 2012, the trial court granted Appellees' motion to strike Dr. Winbery's testimony. Because Dr. Winbery was the sole expert proferred by Appellants, after striking his testimony, the trial court granted summary judgment in favor of the Appellees. Concerning Dr. Winbery's qualifications, the April 12, 2012 order states:

> This case involves allegations of medical malpractice
> against two pediatricians and their employer that they did not
> appropriately monitor bilirubin levels in Lauren Mitchell which
> caused her to have kernicterus [i.e., bilirubin-induced brain
> dysfunction]. On March 31, 2011, [the Mitchells] designated
> their only standard of care Rule 26 expert witness, Dr. Stephen

Winbery. Dr. Winbery's deposition was taken on August 17, 2011. Dr. Winbery listed his profession on his curriculum vitae as an adult emergency room physician. While Dr. Winbery did complete a double residency in pediatrics and internal medicine from June of 1990 to May of 1994, he has never practiced pediatrics. Further, Dr. Winbery has sat for and failed the pediatrics board three times.

Tenn. Code Ann. § 29-26-115(b) states that an expert will not be competent to testify in a medical malpractice case unless he was licensed to practice in Tennessee or a contiguous state in a profession or specialty that would make his expert testimony relevant to the issues in the case in the year preceding the alleged injury. Dr. Winbery has never practiced in the same or similar specialty as Dr. Woods and Dr. Payne. Dr. Winbery has not and cannot show that he is sufficiently familiar with the standard of care for the specialty involved in this case in the year preceding the alleged negligence in this case.

The court has reviewed all filings in this case including the disclosure of Dr. Winbery, Dr. Winbery's deposition and the affidavit[] of Dr. Winbery. Because Dr. Winbery is not sufficiently familiar with the standard of care required of Dr. Woods and Dr. Payne in 2003, the Court must use its discretion to exclude his testimony from trial because he is not competent to testify in this matter. This Court makes this decision based on its review of *Shipley v. Williams*, 350 S.W.3d 527 (Tenn. 2011) and its progeny.

The Appellants filed a motion to reconsider, along with the supplemental affidavit of Dr. Winbery in support thereof. The trial court denied the motion to reconsider by order of April 25, 2012. In its order, the court specifically excluded the supplemental affidavit, stating:

The Court finds that it cannot consider the second . . . affidavit of Dr. Winbery because [Appellants] failed to show any new information in the . . . supplemental affidavit that was unavailable at the time of the prior response and prior hearing or that such information could not have been found with due diligence and inquiry being exercised by the [Appellants]. Further the [Appellees] would be prejudiced if the second . . . affidavit was allowed. Some of the content of the . . .

supplemental affidavit is the same as previously submitted by deposition and otherwise.

This court finds in its role as gatekeeper and looking at the totality of the case that Dr. Winbery lacks trustworthiness regarding the standard of care at issue in this case.

On April 24, 2012, Appellees filed a motion for discretionary costs, seeking $16,269.28 "for court reporter costs of depositions and for reasonable and necessary expert witness fees for expert witnesses." Appellees' motion was supported by the affidavit of their attorney, J. Bart Pickett. On May 14, 2012, the Mitchells filed a response in opposition to the motion for discretionary costs. By order of May 29, 2012, the trial court awarded Appellees discretionary costs in the amount of $11,764.28, stating that "[t]hese costs reflect[] those costs in the Affidavit of J. Bart Pickett minus those costs for videographers."

The Mitchells appeal. There are two issues for review:

1. Whether the trial court erred in excluding Dr. Winbery's testimony and granting summary judgment in favor of Appellees.

2. If not, whether the trial court erred in the award of discretionary costs.

## Exclusion of Dr. Winbery's Testimony

As noted above, this case was decided upon a grant of summary judgment to the Appellees. It is well settled that the party moving for summary judgment has the burden of persuading the trial court that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. *Martin v. Norfolk S. Ry. Co.*, 271 S.W.3d 76, 83 (Tenn. 2008). The moving party may make the required showing and thereby shift the burden of production to the nonmoving party by either (1) affirmatively negating an essential element of the nonmoving party's claim or (2) showing the nonmoving party cannot prove an essential element of its claim at trial. *Id*.; *Hannan v. Alltel Publ'g Co.*, 270 S.W.3d 1, 5 (Tenn. 2008).

If the moving party makes a properly supported motion, the nonmoving party must produce evidence establishing that a genuine issue of material fact exists. *Martin*, 271 S.W.3d at 84 (citing *McCarley v. W. Quality Food Serv.*, 960 S.W.2d 585, 588 (Tenn. 1998)). A trial court does not weigh the evidence in deciding a motion for summary judgment; rather, it must accept the nonmoving party's evidence as true and draw all

reasonable inferences in favor of the nonmoving party. *Martin*, 271 S.W.3d at 84; *Staples v. CBL Assoc., Inc.*, 15 S.W.3d 83, 89 (Tenn. 2000).

The resolution of a motion for summary judgment is a matter of law. Therefore, we review the trial court's judgment granting the Defendants' motions *de novo*, with no presumption of correctness. *Martin*, 271 S.W.3d at 84; *Blair v. W. Town Mall*, 130 S.W.3d 761, 763 (Tenn. 2004).

The trial court in this case refused to qualify Dr. Winbery as an expert. If Dr. Winbery's qualification was correctly decided, then the Appellants will have failed to rebut the Appellees' proof that they complied with the applicable standard of care so as to create a dispute of material fact as to that element of a malpractice claim. As in prior cases, *Shipley* reaffirmed that a trial court's decision to accept or disqualify an expert medical witness is reviewed under the abuse of discretion standard: "A trial court abuses its discretion when it disqualifies a witness who meets the competency requirements of section 29-26-115(b) and excludes testimony that meets the requirements of Rule 702 and 703." *Shipley*, 350 S.W.3d at 552.

In order to prevail on a medical malpractice claim, a plaintiff must prove each of the elements set forth in Tennessee Code Annotated Section 29-26-115(a): (1) the recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices; (2) that the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and (3) as a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred. Each of these elements must be established by expert testimony. *Shipley*, 350 S.W.3d at 537 (citing *Williams v. Baptist Mem'l Hosp.*, 193 S.W.3d 545, 553 (Tenn. 2006), *Stovall v. Clark*, 113 S.W.3d 715, 723 (Tenn. 2003), and *Robinson v. LeCorps*, 83 S.W.3d 718, 724 (Tenn. 2002)).

In another section, the Tennessee Medical Malpractice Act sets forth the requirements an expert witness must satisfy in order to be competent to testify in a medical malpractice case:

> No person in a health care profession requiring licensure under the laws of this state shall be competent to testify in any court of law to establish the facts required to be established by subsection (a), unless the person was licensed to practice in the state or a contiguous bordering state a profession or specialty which would make the person's expert testimony relevant to the issues in the case and had practiced this profession or specialty

in one (1) of these states during the year preceding the date that the alleged injury or wrongful act occurred. This rule shall apply to expert witnesses testifying for the defendant as rebuttal witnesses. The court may waive this subsection (b) when it determines that the appropriate witnesses otherwise would not be available.

Tenn. Code Ann. § 29–26–115(b).

In *Shipley* the Tennessee Supreme Court clarified the framework for analyzing whether an expert's testimony is admissible in a medical malpractice case. In doing so, the Court explained the distinction between Tennessee Code Annotated Section 29-26-115(a) (elements of malpractice) and (b) (competency of expert):

> Subsections (a) and (b) serve two distinct purposes. Subsection (a) provides the elements that must be proven in a medical negligence action and subsection (b) prescribes who is competent to testify to satisfy the requirements of subsection (a). Therefore, **when determining whether a witness is competent to testify, the trial court should look to subsection (b), not subsection (a).**

*Shipley*, 350 S.W.3d at 550 (emphasis added). As evidenced by its language, subsection (b) has three components: the proposed expert must (1) be licensed to practice in Tennessee or one of its eight contiguous bordering states; (2) practice a profession or specialty which would make the individual's expert testimony relevant to the issues in the case; and (3) have practiced this profession or specialty in one of these states during the year preceding the date of the alleged injury or wrongful act. *Shipley*, 350 S.W.3d at 550.

The only requirement that is at issue in this appeal is whether Dr. Winbery is competent to testify because he is an emergency room physician and the Appellees are board certified pediatricians. Appellees assert that he is not competent to testify as to the applicable standard of care or its alleged breach because Dr. Winbery does not practice a profession or specialty that would make his testimony relevant to the issues in the case. This is the same statutory requirement that was at issue in *Shipley*.

In the recent case of *Westmoreland v. Bacon*, No. M2011–01811–COA–RM–CV, 2013 WL 765091 (Tenn. Ct. App. Feb. 26, 2013), Judge Cottrell, writing for the Court, succinctly explained the holding in *Shipley* and its implication in cases involving the qualification of medical experts:

In ***Shipley*** the plaintiff, Ms. Shipley, alleged the defendant, Dr. Williams, who was a general surgeon, committed medical malpractice by failing to admit her when she presented herself to the emergency room following an operation, failing to assess and diagnose her condition properly, and failing to provide necessary medical treatment. ***Shipley***, 350 S.W.3d at 533. Dr. Williams filed a motion for partial summary judgment on the failure to admit claim, and Ms. Shipley relied on an affidavit by Dr. Ronald Shaw, an emergency room physician, to oppose the motion. ***Id***.

Dr. Williams moved to disqualify Dr. Shaw, and the trial court ruled that Dr. Shaw was not qualified to testify as an expert because, as an emergency room physician, he did not practice a specialty relevant to the standard of care issues applicable to a general surgeon. ***Id***. at 534. The Supreme Court, however, applying a clarified standard, disagreed. Specifically, the Court stated that it would be inclined to agree with the trial court's reasoning if the issues in the case pertained to surgery. ***Id.*** at 556. However, Tennessee Code Annotated Section 29–26–115(b) requires only that the proposed expert practice a profession or specialty that would make his or her testimony relevant to the issue(s) in the case, not that the proposed expert practice the same profession or specialty as the defendant. ***Id***. Accordingly, the Court examined the issues and claims in the case and found that they pertained to whether Dr. Williams provided appropriate and timely follow-up care to Mrs. Shipley, not to the surgery Dr. Williams performed. Dr. Shaw testified that he was familiar with the standard of care applicable to a surgeon in the limited area of the standard of communication between a referring doctor and an emergency room doctor, how to apportion responsibility for deciding whether the patient should be admitted, and how, when, and by whom a patient should receive follow-up care. ***Id***. at 557. Thus, the Supreme Court reversed the trial court's disqualification of Dr. Shaw and concluded he was competent to testify as an expert because his testimony was probative and relevant to the issues Mrs. Shipley raised in her lawsuit. ***Id.***

Following the analysis in ***Shipley***, we must first determine the issues and claims in the case before us. Then, we can determine whether [the proffered expert] practices "a

profession or specialty which would make the individual's expert testimony relevant to the issues in the case." Tenn. Code Ann. §29-26-115(b). A court's inquiry into the competency of a proffered witness requires an examination of the issues presented in the case to determine whether the expert's profession or specialty makes the expert's testimony relevant to those issues.

*Westmoreland*, 2013 WL 765091, at \*4–\*5.

Turning to the instant case, the issues and claims averred here involve the recognized standard of professional care for pediatricians providing care to neonates with jaundice and hyperbilirubinemia.

With regard to the applicable standards of care at issue, Dr. Winbery testified through his affidavit regarding his practice and specialty and his experience and training that would make his profession relevant to the issues:

> 2. I am a medical doctor having graduated from LSU Medical School in May 1990. Prior to medical school, I obtained a Ph.D. degree in Pharmacology at LSU. From 1990 to 1994 I participated in and completed a pediatric and internal medicine residency at the University of Tennessee Center for Health Science in Memphis, Tennessee. I am board certified by the American Board of Internal Medicine.

> 3. I was licensed to practice medicine in Tennessee on February 28, 1992 and have practiced continuously since that time. I practice in the specialties of pediatrics, toxicology, and emergency medicine.

> 4. I am employed by and practice with the University of Tennessee and the U.T. Medical Group, Inc. U.T. Medical Group is a private practice arm of the University of Tennessee Health Science Center faculty. U.T. Medical Group provides medical care in the specialities of anesthesiology, emergency medicine, family medicine, medicine, pediatrics, neurology, psychiatry, radiology, surgery, OB/GYN, ophthalmology, otolaryngology, and urology.

*              *              *

> 5. I am familiar with the recognized standard of acceptable professional practice for medical doctors practicing in a specialty that treats newborns with jaundice, Family Practice, and Pediatrics . . . .[5]

Although, in paragraph 3 of his affidavit, *supra*, Dr. Winbery states that he has practiced in "the specialties of pediatrics," his curriculum vitae does not indicate any professional experience in the field of pediatrics, other than his four-year residency (1990 to 1994). Rather, the vitae indicates that Dr. Winbery has practiced as an attending physician in emergency medicine, and has been the medical director of the Southern Poison Center. He has taught at the University of Tennessee Medical School in the areas of emergency and internal medicine and toxicology.

In his deposition testimony, taken on August 17, 2011, Dr. Winbery testified, in relevant part, as follows:

> Q. Where do you practice medicine?
>
> A. Currently, I practice at the VA Medical Center in downtown Memphis in the emergency department and at the Delta Medical Center . . . in the hospital . . . the ICU and in the emergency department.
>
> *              *              *
>
> Q. All right. Now, how long have you been at the VA Medical Center?

---

[5] Concerning the supplemental affidavit that was filed with the Appellants' motion to reconsider, and was subsequently disallowed by the trial court, we have reviewed that affidavit and agree with the trial court's conclusion that the second affidavit does not contain information that was unknown, or unknowable, at the time of the filing of the original affidavit. Moreover, the portions of the second affidavit that are relevant to the question of Dr. Winbery's qualification to testify concerning the issues in this case are reiterations of testimony given in his deposition, which was considered by the trial court. Accordingly, even if we assume, *arguendo*, that the trial court erred in disallowing the second affidavit, that error would be harmless because the relevant information in the second affidavit was contained either in the first affidavit, or in Dr. Winbery's deposition testimony, both of which were considered by the trial court in excluding Dr. Winbery.

-10-

A.  About one year.

Q.  And at the Delta Medical Center, how long have you been there?

A.  A year and a half.

*                              *                              *

Q. [O]ther than this case, have you ever been an expert in a case that involved kernicterus or hyperbilirubinemia or the issues that are involved in this case?

A.  No.

Q.  Have you ever published regarding those issues.

A.  No.

*                              *                              *

Q.  And after [graduating from medical school at LSU], what did you do as far as furthering your medical training?

A.   I went to the University of Tennessee Medical Center medicine pediatric program in Memphis from 1990 to 1994. And then I was chief of internal medicine at Methodist Central Hospital for one year in 1995.

*                              *                              *

Q.  The publications that are listed on your CV, none of those address the medical issues related to kernicterus or hyperbilirubinemia or the cause of those conditions; is that correct?

A.  That is correct.

Q.   And you've not done any research in regard to those conditions, have you, other than looking at some medical

-11-

literature?

A. For this case, looking at medical literature and practice, I've seen, I don't know, dozens of them, maybe hundreds of them. I'm not sure if you include the training at the newborn center. Seems like we had a whole football field of jaundice children at any given time.
But I did—there was a small study that I participated in around, I want to say 1999 to 2000 where a new device came out. It was a blanket [for the treatment of jaundice] . . . . And we just—a few of us had input on how that was done and what patients we enrolled.[6]

Dr. Winbery further testified that, although he had attempted the pediatric board exam on three separate occasions, he had yet to pass the exam:

Q. You've taken the pediatric [board certification] exam—

A. Three—

Q. —three times.

A. Three times.

Q. Right.

A. And not successfully completed it.

Q. Right.

Concerning the pediatric patients that Dr. Winbery has treated, he further testified:

Q. All right. Now, from 1994 until currently, the pediatric patients that you have seen have been in the context of emergency room, for the most part?

---

[6] Dr. Winbery went on to state that the blanket study was never published and that the blankets were not ultimately used in the treatment of jaundice in newborns. In fact, Dr. Winbery admits that this "study" was conducted by the manufacturer or vendor of the blanket and was not performed under the usual standard of medical studies.

A. Yes, and in the context of the toxicology. In other words, seeing patients in the hospital that have been poisoned or neonatal specific patients whose mothers were either poisoned or addicted.

Q. Okay. So some mother comes and a test shows cocaine, you might get involved in that type of situation?

A. Up until 2004, yes, I would go over to the neonatal center if the child was in significant duress or there was some question, we would go over and consult on that patient.

Q. Now, you–you weren't seeing patients in a pediatric practice from 1994 until present; is that correct?

A. Yes, sir.

Q. In other words, you're not like Dr. Woods or Dr. Payne seeing newborns in a hospital after they've been born?

A. I would–I would see newborns after they've been born, only as a consultant to–up until 2004, only as a consultation to the poison service. And usually, like I said, that main issue would be mother's addiction.

\*                              \*                              \*

Q. Okay. How many cases of kernicterus do you think you've seen in your career?

A. Well, it would be hundreds in training just because the neonatal center—it's the neonatal center for the whole region at The Med . . . .
    After that, I would say probably two dozen a year through The Regional Medical Center . . . . Most of those children had been discharged, and it wasn't until between, like I said, 2000–2004 that I began to go back into the neonatal unit and actually see patients that were newly born, most of them with issues of intoxication from their mother.

-13-

*                          *                          *

Q. Ha[s] any of your testimony in prior medical malpractice cases involved issues related to care of newborns, just in general?

A. Right. I'm thinking of—no.

Q. And I think we–I've asked you this before. None of these cases have dealt with the issue—issues that are relevant in this lawsuit regarding hyperbilirubinemia, kernicterus, or this child's brain injury?

A. I'm not sure if that's a yes or no, but I agree with you. This is the first case that I've testified in that had the particular issues of brain injury from hyperbilirubinemia, kernicterus or developmental delay.

*                          *                          *

Q. Have you ever presented in grand rounds teaching the residents on the issues of kernicterus or hyperbilirubinemia?

A. Not a grand rounds, no. The only time that would have come in is when I talked about cocaine abuse and the effect it has on children, because jaundice is one of the issues that you may see in that scenario. It is fairly routine in the emergency department in our curriculum to talk about [a?] jaundiced infant in the first week of life, and that's just part of our regular didactic teaching.

Q. Are you a member of the department of pediatrics at any hospital?

A. I am not.

As noted above, the designation for Dr. Winbery indicated that he was expected to testify concerning jaundice, bilirubin metabolism, bilirubin encephalopathy, and the standard of care under the American Academy of Pediatrics' Guidelines for jaundice. In postulating that Dr. Winbery is qualified to testify as an expert in these areas, the Mitchells argue that,

as an emergency room physician, Dr. Winbery's practice includes many pediatric cases. As Dr. Winbery's deposition testimony indicates, however, his experience with newborns is usually limited to diagnosis and treatment for addiction caused by the mother's drug abuse. Consequently, his expertise is in the area of toxicology, not pediatric jaundice or bilirubin metabolism. The Mitchells further argue that Dr. Winbery has knowledge and experience that make his testimony relevant, including his residency in pediatrics, his membership in the American Academy of Pediatrics, published articles in the specialty of pediatrics, and eligibility for the American Board of Pediatrics. In the first instance, Dr. Winbery, by his own testimony, has not published in the area of pediatric medicine. Moreover, he is not board-certified in the area of pediatrics, having failed to successfully complete the examination. However, it is clear that Dr. Winbery has had some experience and practice in pediatrics based upon his residency in this field. We further note that Dr. Winbery has seen numerous cases of jaundice in infants. The problem with his qualification to testify in this case is that, by his own admission, he has not practiced in this area in the year preceding the alleged negligent acts at issue in this case. Rather, his pediatric practice concluded in 1994 when his residency ended. As set out above, the *Shipley* Court held that, in determining an expert's competency, the court should look to Tennessee Code Annotated Section 29-26-115(b). One of the criteria under Section 29-26-115(b) is that the proferred expert must have practiced the relevant "profession or specialty in . . . the year preceding the date of the alleged injury or wrongful act." *Shipley*, 350 S.W.3d at 550. The minor child's injuries were sustained at the time of her birth, April 26, 2003. In the year proceeding that date, Dr. Winbery was engaged in the practice of emergency medicine, seeing jaundiced infants only in relation to their admission to the emergency room and not as a specialist like Dr. Woods and Dr. Payne. Although, as noted above, specialization is not a prerequisite to the ability of a doctor to offer expert testimony, the purported expert must, nonetheless, have practiced in an area that would allow him or her to testify expertly concerning the specific issues raised in the lawsuit. Here, there is simply no evidence to support a finding that Dr. Winbery has current or recent expertise in the field of jaundice, bilirubin metabolism, bilirubin encephalopathy, or the standard of care under the American Academy of Pediatrics' Guidelines for jaundice such that his testimony would aid the trier of fact in a determination of whether Dr. Woods or Dr. Payne deviated from the applicable standard of care. Accordingly, we cannot conclude that the trial court erred in its finding that Dr. Winbery was not qualified to testify as an expert in this particular case. As discussed above, in the absence of expert testimony, Appellants have failed to rebut the evidence that Dr. Woods and Dr. Payne complied with the applicable standard of care.

## Discretionary Costs

Appellants argue that the trial court erred in awarding Appellees discretionary costs in the amount of $11,764.28. When determining whether to award discretionary costs, trial

courts are directed to: (1) determine whether the party requesting the costs is the "prevailing party;" (2) limit awards to the costs specifically identified in the rule; (3) determine whether the requested costs are necessary and reasonable; and (4) determine whether the prevailing party has engaged in conduct during the litigation that warrants depriving it of the discretionary costs to which it might otherwise be entitled. ***Massachusetts Mut. Life Ins. Co. v. Jefferson***, 104 S.W.3d 13, 35 (Tenn. Ct. App. 2002).

Parties are not entitled to costs under Tennessee Rule of Civil Procedure 54.04(2) simply because they prevail at trial. ***Sanders v. Gray***, 989 S.W.2d 343, 345 (Tenn. Ct. App. 1998). The particular equities of the case may influence a trial court's decision about these costs. ***Perdue v. Green Branch Mining Co.***, 837 S.W.2d 56, 60 (Tenn.1992); ***Stalsworth v. Grummons***, 36 S.W.3d 832, 835 (Tenn. Ct. App.2000). "However, the courts should, as a general matter, award discretionary costs to a prevailing party if the costs are reasonable and necessary and if the prevailing party has filed a timely and properly supported motion." ***Massachusetts Mut. Life Ins. Co.***, 104 S.W.3d at 35 (citing ***Scholz v. S.B. Int'l, Inc***., 40 S.W.3d 78, 85 (Tenn. Ct. App.2000)). The award of discretionary costs, like the award of other costs, is within the trial court's reasonable discretion. ***Perdue***, 837 S.W.2d at 60. "The 'abuse of discretion' standard of review calls for less intense appellate review and, therefore, less likelihood that the trial court's decision will be reversed." ***Mass. Mut. Life Ins. Co. v. Jefferson***, 104 S.W.3d 13, 35 (Tenn. Ct. App.2002) (citations omitted). The abuse of discretion standard does not permit this Court to second-guess the lower court's judgment or merely substitute an alternative we prefer. ***Lee Med., Inc. v. Beecher***, 312 S.W.3d 515, 524 (Tenn. 2010) (citation omitted). We must instead affirm the discretionary decision so long as reasonable legal minds can disagree about its correctness. ***Eldridge v. Eldridge***, 42 S.W.3d 82, 85 (Tenn. 2001) (citations omitted). A trial court abuses its discretion if it (1) applies an incorrect legal standard, (2) reaches an illogical or unreasonable decision, or (3) bases its decision on a clearly erroneous evaluation of the evidence. ***Elliott v. Cobb***, 320 S.W.3d 246, 249–50 (Tenn. 2010) (citation omitted). A trial court also abuses its discretion if it strays beyond the applicable legal standards or when it fails to properly consider the factors that customarily guide a discretionary decision. ***Beecher***, 312 S.W.3d at 524 (citation omitted).

Tennessee Rule of Civil Procedure 54.04(2) specifically allows for a prevailing party to recover the following discretionary costs:

> reasonable and necessary court reporter expenses for depositions or trials, reasonable and necessary expert witness fees for depositions (or stipulated reports) and for trials, reasonable and necessary interpreter fees for depositions or trials, and guardian ad litem fees; travel expenses are not allowable discretionary costs.

Here, the Mitchells argue that the trial court abused its discretion by including, in its award of discretionary costs, certain costs that are disallowed under the foregoing rule. Specifically, the Mitchells contend that the $11,764.28 includes charges for videographer fees, which may not be recovered. *See **Russell v. Brown***, No. E2004-01855-COA-R3-CV, 2005 WL 1991609 (Tenn. Ct. App. Aug. 18, 2005). However, the trial court's order specifically states that "[t]hese costs reflect[] those costs in the Affidavit of J. Bart Pickett minus those costs for videographers." Because a trial court speaks through its order, ***Palmer v. Palmer***, 562 S.W.2d 833, 837 (Tenn. Ct. App.1977), we must conclude that videographer charges were not, as the Mitchells argue, included in the $11,764.28. In addition, the Mitchells argue that the award of discretionary costs includes "all charges for copies of depositions, condensing, binding/handling . . . word index, binding of exhibits, and postage/delivery," which they argue are excluded items. The trial court's order does not specifically itemize the individual costs that comprise the $11,764.28 award. However, we have reviewed the affidavit and supporting documentation filed by Appellees' attorney in support of the motion for discretionary costs. From the record, we cannot conclude that the award of $11,764.28 was outside the range of reasonableness, nor that the award constitutes an abuse of the trial court's discretion by inclusion of costs that are specifically excluded under Tennessee Rule of Civil Procedure 54.04.

For the foregoing reasons, we affirm the order of the trial court. The case is remanded for further proceedings as may be necessary and are consistent with this opinion. Costs of this appeal are assessed against the Appellants, Stacey Mitchell and Bryan Mitchell, and their surety.

_____
J. STEVEN STAFFORD, JUDGE