IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 8, 2019 Session

## CHRISTOPHER CONRAD FICHTEL v. JILL CROWELL FICHTEL (ZIRWAS)

**Appeal from the Circuit Court for Davidson County**
**No. 09D-3512      Philip E. Smith, Judge**

_____

### No. M2018-01634-COA-R3-CV

_____

This appeal results from Father's petition in opposition to relocation. Trial on the petition was held over a period of more than a year. Ultimately, the trial court granted Father's petition in opposition and modified the parties' child support obligation to take into account their changed incomes. We vacate the trial court's determination of Father's income for child support purposes, but affirm the trial court's rulings in all other respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part; Vacated in Part; and Remanded**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which KENNY ARMSTRONG and CARMA D. MCGEE, JJ., joined.

Jeffrey L. Levy, Smyrna, Tennessee, for the appellant, Jill Crowell Fichtel (Zirwas).

Robert L. Jackson and Elizabeth A. Garrett, Nashville, Tennessee, for the appellee, Christopher Conrad Fichtel.

### OPINION

The parties, Petitioner/Appellant Jill Crowell Fichtel (Zirwas) ("Mother") and Respondent/Appellee Christopher Conrad Fichtel ("Father") divorced in 2010. The parties' permanent parenting plan named Mother primary residential parent of their two children, Thomas, born in 2005, and Audrey, born in 2007. Father was awarded 134 parenting days with the children, and Mother, who earned a significant income as a

physician, was ordered to pay child support.[1] Following the divorce, the parties appeared to cooperate well in parenting the children, often exchanging days based on scheduling. The parenting plan also provided that the children were to attend parochial school at Mother's sole expense.

Father married Liege Fichtel ("Step-Mother") in February 2013. The children attended the wedding. Step-Mother admitted that she is an alcoholic who has been maintaining her sobriety for several years. Step-Mother has two minor sons, one of which has an Autism Spectrum Disorder.

Mother subsequently became engaged to another physician, Matt Zirwas ("Step-Father") who lives and practices in Ohio. Although Step-Father sought employment in Nashville, he was not able to find comparable employment as a medical school professor. Step-Father has two minor children who reside with him half of the time. As such, Mother made the decision to relocate to Ohio. On or about April 20, 2013, Mother and Step-Mother had lunch wherein Mother informed Step-Mother of the proposed move. Without Father's participation, Mother informed the children of the move. They were understandably upset.

Mother sent formal notification of her planned relocation on April 24, 2013. According to Mother, Father initially agreed to the move, citing an email in which Father stated he would look over and sign a modified parenting plan. Father, however, asserts that he never formally agreed to the move, again citing text messages in which his reluctance to agree was demonstrated. On May 22, 2013, Father filed a petition in opposition to the relocation in the Davidson County Circuit Court ("the trial court"). In addition to requesting that the relocation be denied, Father asked that if Mother nevertheless chooses to relocate, he be named primary residential parent, the parties' parenting plan be modified to provide equal time, and child support be modified pursuant to the Tennessee Child Support Guidelines.

On June 7, 2013, Mother responded in opposition to Father's petition. Mother also filed a counter-petition seeking to modify the parties' permanent parenting plan and child support obligations and to hold Father in criminal contempt. Therein, Mother asserted that she was blind-sided by Father's opposition to the relocation, as she believed the matter had been amicably resolved with Father's consent to the relocation. Mother noted that based on this alleged consent, she had given notice to her employer that her employment was to terminate on June 9, 2013, and she could not get her job back. Mother also noted that a non-compete clause prevents her from working in the Nashville area for a period of one-year and her home has been placed on the market. Mother generally argued that she should be allowed to relocate because she spent substantially more time with the children and she was the children's primary caregiver. Mother also noted Father's nonchalance and even willful failure in responding to Thomas's

---

[1] Mother is a dermatologist, while Father is a pharmacist.

developmental issues, including testing and treatment for his Attention Deficit Hyperactivity Disorder ("ADHD"). Mother noted that she had located an appropriate school for Thomas in Ohio. Thomas's diagnosis and treatment would become a central issue in this case.

Mother's criminal contempt claim stemmed, *inter alia*, from her allegation that Father was viewing pornography despite a provision in the parties' parenting plan prohibiting such conduct.[2] Mother requested that the parties' residential parenting schedule be amended to accommodate her anticipated move to Columbus, Ohio and that the plan "be further modified to name Mother as the sole decision maker, or at least the tie breaker with regard to educational decisions, non-emergency healthcare decisions, and extra-curricular activities for the minor children."

Trial on the petition in opposition to the relocation was held over twenty-two non-consecutive days from November 19, 2013 and November 14, 2014.[3] By the time of trial, Mother had married Step-Father; the children did not attend the wedding. Mother had also obtained employment in Ohio working only a few days per week making approximately $240,000.00 per year. Prior to the termination of her employment in Nashville, she earned in her most recent year approximately $850,000.00. There was considerable dispute as to whether Mother was on call for her Nashville employment; in any event, she testified that she looked for other similar jobs and was unable to find a comparable one and that she wanted to decrease her hours in order to spend more time with the children. During trial, the parties provided extensive evidence concerning the parenting schedule. Prior to the requested relocation, the parties were able to make adjustments to accommodate each parent's schedule, resulting in Father having more time than the parenting plan provided. Following the filing of the opposition petition, however, Mother insisted that the parties abide by the parenting plan. Following trial, on March 23, 2015, the parties entered into a stipulation setting forth which parent was entitled to claim all but a few of the parenting days both prior to the petition being filed and prior to the first hearing date.

Both parties presented substantial evidence concerning the best interest factors, including expert proof about the effect of the relocation/change in custody on the children.[4] Mother testified that Father was initially unwilling to seek treatment for

---

[2] Unfortunately, the pornography issues would come to also be a central dispute in this case, but both parties now admit that these allegations against Father were unfounded. As such, although there was considerable back-and-forth on this issue, including lay and expert testimony presented, we choose not to tax the length of this opinion with a recitation of allegations that were ultimately found inaccurate beyond what is strictly necessary to adjudicate this appeal.

[3] Following the presentation of live proof, in January 2015, the parties presented several video-depositions to the trial court. The parties later reconvened to argue issues related to child support and attorney's fees.

[4] In total, nineteen witnesses testified, including both parents, both step-parents, Thomas, two child experts, Thomas's current therapist, a financial expert, various members of Mother's family, the

- 3 -

Thomas's issues, including boundary and attention deficiencies. Eventually, Mother took Thomas to have diagnostic testing at Currey Ingram Diagnostic Center. Father did not submit required forms prior to the testing and Mother characterized his involvement with the testing as uncooperative. Based on the testing, Thomas was eventually diagnosed with ADHD; medication was recommended. Again, Father was initially unwilling to medicate Thomas; Father eventually relented, however, and both parties agree that the medication has been very helpful to Thomas. Father testified that his reluctance to medicate Thomas was based on his knowledge as a pharmacist and his desire to try other treatments prior to medication. Although Thomas's school was able to make accommodations for Thomas's needs, Mother testified that she had located a school in Ohio, Marburn Academy that is a top school to meet Thomas's needs. Mother testified that Thomas has made friends in Ohio. Mother also testified that if Thomas stayed in Nashville, he should be moved to Currey Ingram Academy, a similar school. The principal of Currey Ingram Academy testified that both it and Marburn Academy were excellent schools to meet Thomas's needs; she could not opine as to whether Thomas's current school was comparable, but was concerned about the large class size.

Mother testified that Father works long hours and therefore spends little quality time with the children; for example, Mother testified that on a number of occasions, Father brought the children with him to work during his time or allowed other members of his or Mother's family to care for the children.[5] Moreover, Mother testified that a large portion of Father's time with Thomas includes playing violent video games; in contrast, Mother's time with the children involves board games and other age-appropriate activities. According to Mother and her witnesses, Father allowed Audrey to go to school in a dirty disheveled state on more than one occasion.

Mother also testified that Father is generally not involved in the children's doctors' visits, school activities, church, or extracurricular activities. Father testified, however, that the parties agreed to change the children's doctor to one whose office is in the same building as Mother's office, making it more convenient for Mother to attend doctor's visits. Moreover, the children attend church at their parochial school; Father, however, not Catholic, and the children's principal testified that it is not unusual for non-Catholic parents not to attend Catholic Church services. With regard to medical care Mother stated that Father forgot to give Audrey required allergy medication on several occasions. Father conceded that he may have forgotten from time to time, but asserted that he is cognizant of the children's medical needs. Father countered that Mother chooses to keep a cat in her home despite Audrey's allergies, a choice that necessitates Audrey taking regular allergy shots. Mother asserted that the choice to keep the cat was Audrey's.

children's current principal, teachers for both children, and the doctor that performed the diagnostic testing on Thomas at the Currey Ingram Diagnostic Center.

[5] Mother's extended family resides in Nashville and is close with the children. Father's parents live part-time in Nashville in their motorhome.

Father testified that he enjoys substantial quality time with the children, including playing video games, traveling, and fishing, which Audrey particularly enjoys. Father denied that he did not attend the children's activities and events; rather he asserted that Mother prevented him from scheduling some events, including tennis practices. Father listed various events he attended with the children, including some parent-teacher conferences, school trips, the school carnival, and a Halloween party. There was some testimony that Thomas was being bullied by Step-Mother's sons; Father and Step-Mother testified that all alleged bullying against Thomas had now been remedied. Father testified, however, that Thomas had bullied another child at school and shown no remorse. Father indicated that he approved of corporal punishment against Thomas in this instance, unlike Mother.

Father also testified to other alleged actions taken by Mother after the filing of the opposition petition, such as sneaking into Father's home to take pictures of his secured gun and prompting Thomas to send a video to Father asking that he spend more time with the children. Mother and Thomas both denied that Mother was involved with the filming of the video; Mother later admitted that she was holding the phone during the recording.

Both parties presented expert testimony concerning the effect of the relocation on the children. Father's expert, Dr. Bradley Freeman, a psychiatrist, generally testified that the children's best interests were served by allowing them to remain in Nashville, where their school, friends, and most of their family reside. In particular, Dr. Freeman testified that relocating to Ohio "would be unduly difficult for Thomas." Dr. Freeman reached this conclusion based on Thomas's ADHD diagnosis, which can make changes in environments difficult for children. Dr. Freeman also noted that the relocation would result in a significant decrease in Father's involvement with Thomas, a troubling change given their close relationship. As evidence of this close relationship, Dr. Freeman noted Thomas's statement that he would miss Father more than Mother. Dr. Freeman testified that the child's attachment to Father was appropriate and healthy. In Dr. Freeman's opinion, ambivalent attachment is rare and occurs in abusive situations not present in this case.

Dr. Freeman also noted that it is only recently that Thomas has been able to make friends in his school and that a change could disrupt his progress. Although Dr. Freeman noted that Thomas does have some friends in Ohio, he also testified that they were not as close. Dr. Freeman explained that any issues of bullying with Thomas's step-brothers had ceased. Another factor in Dr. Freeman's opinion was his belief that a move would take Thomas away from David Thomas, the therapist with whom Thomas has made substantial progress.

According to Dr. Freeman, Audrey strongly identifies with Mother. However, he still opined that the move was not in Audrey's best interest. Dr. Freeman conceded that the relocation would be less difficult for Audrey but testified that she would still encounter difficulties, as adapting to change and seeing less of Father would not be ideal.

In support, Dr. Freeman noted Audrey's strong and repeated preference that both she and Mother stay in Nashville.

Dr. Freeman also expressed concern that Mother testified she would move to Ohio regardless of the trial court's ruling. To Dr. Freeman, this decision illustrated that Mother's priority was her marriage, rather than her children. Dr. Freeman explained that this opinion was bolstered by Mother's decision to call Thomas to testify,[6] as well as Mother's decision to call Thomas's ongoing therapist, David Thomas, to testify, which Dr. Freeman testified could harm the therapeutic relationship.[7] Dr. Freeman also testified that he was highly suspicious that Thomas's video was made independently and unsolicited by Mother. Finally, Dr. Freeman opined that children would suffer more harm from a move than a change in custody.

Mother's expert, Dr. David McMillan, a licensed community psychologist, disagreed with Dr. Freeman's conclusions. According to Dr. McMillan, Dr. Freeman focused too heavily on the children's preferences, rather than the question of whether a move to Ohio was better for the children than a change in custody. As an initial matter, Dr. McMillan did not find that Thomas's ADHD was a relevant factor in the relocation analysis, as there would "be trouble" with Thomas regardless of where he moved. Moreover, Dr. McMillan testified that while Thomas's attachment to Father is "strong," it is not secure; rather, the attachment is ambivalent and essentially desperate due to Father's only sporadic involvement in Thomas's life. In contrast, both Thomas and Audrey have a strong and secure attachment to Mother, who is their confidant.

Dr. McMillan also evaluated whether each parent was exhibiting healthy parenting. According to the criteria used by Dr. McMillan, Mother was clearly the healthier parent, taking into account Thomas's special needs. Dr. McMillan particularly took issue with two of Father's choices: (1) to use physical punishments against Thomas, an already sensitive and anxious child; and (2) to allow Thomas to play video games, which are known to be inappropriate for children with ADHD or those that lack empathy. Dr. McMillan also testified that Mother's organizational skills are integral to Thomas's success and that during interviews Father and Step-Mother criticized Mother, suggesting that they are not facilitating the children's relationship with Mother.

Dr. McMillan also took issue with Dr. Freeman's finding that Thomas has closer friends in Nashville. For example, although Thomas did state that he had a best friend in Nashville, this friend has repeatedly declined to go on play dates with Thomas. Further, Dr. McMillan noted that Thomas stated that he "mostly" wants to go with Mother to Ohio.

---

[6] The trial court specifically notes in its order that it requested that Thomas testify concerning the making of the June 14, 2013 video.

[7] Mr. Thomas likewise testified that he attempted to persuade Mother not to call him as a witness, but Mother insisted.

Dr. McMillan further testified that Mother's relocation should be permitted because the move will make Mother happy, and by extension, the children. Dr. McMillan opined that it is healthy for Mother to desire an intact family unit and that it is healthy for children to be a part of such a family. Because Mother is the primary residential parent, Dr. McMillan testified that her decision to move to Ohio should be respected as Mother has the right to weigh the cost and benefit of the move "her way." Finally, Dr. McMillan testified that any change in custody to Father would cause more harm to the children than if the children were allowed to relocate to Ohio with Mother.

Father's current income was also at issue due to Father's self-employment. Following the divorce, Father opened his own pharmacy. His 2013 tax return showed wages of $442,068.00. As detailed *infra*, Father's certified public accountant, Ronald Williams, testified by deposition that Father's actual useable income was much lower, as certain profits were invested back into the business. Mother did not offer her own expert to rebut Mr. Williams's testimony.

The trial court issued a detailed and thorough memorandum order on May 17, 2016. In its order, the trial court detailed the testimony of every witness, as well as the weight and credibility to be assigned to their testimony. The trial court found that of the eleven disputed days in the year prior to the first hearing date, six would be assigned to Mother and five to Father; as such, the trial court found that Mother exercised 55% of the time with the children, which the trial court found was substantially equal. The trial court also rejected Mother's argument that Father should not be allowed to contest the relocation under theories of equitable estoppel and unclean hands. In support, the trial court noted that Tennessee Code Annotated section 36-6-108(a) gave Father thirty days in which to contest the relocation and he never formally nor finally agreed to allow Mother to relocate prior to the expiration of that time frame.

The trial court therefore went on to consider the children's best interests, making detailed findings as to each factor. The trial court also explicitly found that Mother lacked credibility, as he determined that she had been untruthful regarding her involvement in the June 2013 video sent to Father. The trial court also credited the testimony of Dr. Freeman over Dr. McMillan, as the trial court disagreed with Dr. McMillan's focus on Mother's happiness, rather than the children's best interests. After considering all the factors and the weight that they would be assigned, the trial court ruled that the children's best interests did not favor relocation. The trial court therefore denied Mother's request to relocate and ordered her to make a decision as to whether she would nevertheless relocate in ten days. If Mother made the decision to move, the proof could be reopened to allow Father to present additional proof as to the children's best interest. Mother ultimately chose not to relocate.

On January 13, 2017, the trial court entered a second order resolving remaining issues of child support and attorney's fees and costs. Therein, the trial court credited the testimony of Father's expert that his true income was not reflected on his tax documents

and set his income at $223,441.00. The trial court also declined to find that Mother was willfully and voluntarily underemployed, finding instead that her decision to leave her employment in Nashville was reasonable under the circumstances. As such, the trial court found that Mother's income for child support purposes would be set at $240,000.00 per year. The trial court did, however, award Father the totality of his claimed attorney's fees and the majority of his costs. The attorney's fees alone exceeded $195,000.00. The trial court set the new child support obligation to begin on February 1, 2017.

Father filed a motion for additional findings of fact, which was resolved in March 2017. Mother thereafter appealed; the appeal was dismissed as several outstanding issues remained pending. *See Fichtel v. Fichtel*, No. M2017-00409-COA-R3-CV, 2018 WL 1778606, at *2–*4 (Tenn. Ct. App. Apr. 13, 2018). The trial court thereafter entered an agreed order resolving all outstanding issues. Mother again appealed. The record in the prior appeal was consolidated with this appeal by order of November 20, 2018.

### ISSUES PRESENTED

Mother raises the following issues, which are restated:

1. Whether the trial court erred in finding that the parties spend substantially equal time with the children pursuant to Tennessee Code Annotated section 36-6-108(d).
2. Assuming that Mother spends substantially more time with the children, whether Father failed to show that Mother's proposed relocation did not have a reasonable purpose, that it was vindictive in that it was intended to defeat or deter Father's parenting time or that it posed a threat of specific or serious harm.
3. Whether the trial court erred in finding that relocation was not in the children's best interest under 36-6-108(c).
4. Whether the trial court erred in both setting the amount of child support and in failing to make it retroactive?
5. Whether the trial court erred in its award of attorney's fees and costs.

In the posture of appellee, Father raises two issues:

1. Whether the trial court erred in its determination of Mother's income for child support purposes.
2. Father should be awarded his reasonable attorney's fees on appeal.

### STANDARD OF REVIEW

The trial court heard this case sitting without a jury. Accordingly, we review the trial court's findings of fact de novo with a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). No presumption of

correctness, however, attaches to the trial court's conclusions of law, and our review is de novo. **Blair v. Brownson**, 197 S.W.3d 681, 684 (Tenn. 2006) (citing **Bowden v. Ward**, 27 S.W.3d 913, 916 (Tenn. 2000)). However, "we are mindful that trial courts are vested with wide discretion in matters of child custody and that the appellate courts will not interfere except upon a showing of erroneous exercise of that discretion." **Johnson v. Johnson**, 165 S.W.3d 640, 645 (Tenn. Ct. App. 2004) (quoting **Koch v. Koch**, 874 S.W.3d 571, 575 (Tenn. Ct. App. 1993)). We recognize that "custody and visitation determinations often hinge on subtle factors, including the parents' demeanor and credibility" during the proceedings, and further note that "appellate courts are reluctant to second-guess a trial court's decisions." **Id.** (**Gaskill v. Gaskill**, 936 S.W.2d 626, 631 (Tenn. Ct. App. 1996)). This Court's "paramount concern" is the well-being and best interests of the child at issue, and such determinations necessarily hinge on "the particular facts of each case." **Id.** (citing **Koch**, 874 S.W.2d at 575).

Finally, the trial court's findings on credibility are entitled to great deference on appeal. *See* **Taylor v. McKinnie**, No. W2007-01468-COA-R3-JV, 2008 WL 2971767, at *4 (Tenn. Ct. App. Aug. 5, 2008). Where the trial court's factual determinations are based on its assessment of witness credibility, this Court will not reevaluate that assessment absent clear and convincing evidence to the contrary. **Franklin Cty. Bd. of Educ. v. Crabtree**, 337 S.W.3d 808, 811 (Tenn. Ct. App. 2010) (citing **Jones v. Garrett**, 92 S.W.3d 835, 838 (Tenn. 2002)).

## ANALYSIS

### I.

The impetus of the present case is Mother's desire to relocate from Nashville, Tennessee, to Ohio with the parties' minor children. We therefore begin our analysis with the statutory requirements found in Tennessee's parental relocation statute, Tennessee Code Annotated section 36-6-108. The statute applicable to this case outlines different approaches to a petition for relocation depending on which parent spends more time with the child. Specifically:

> If the parents are actually spending substantially equal intervals of time with the child and the relocating parent seeks to move with the child, the other parent may, within thirty (30) days of receipt of notice, file a petition in opposition to removal of the child. No presumption in favor of or against the request to relocate with the child shall arise. The court shall determine whether or not to permit relocation of the child based upon the best interests of the child. The court shall consider all relevant factors including those factors found in § 36-6-106(a)(1)-(15).

Tenn. Code Ann. § 36-6-108(c) (2017). Thus, under this version of the statute,[8] the threshold question is whether the parties spend "substantially equal" time with the child. *Id.* Where a trial court finds that the parents are in fact spending substantially equal time with the child, a best interest analysis is utilized to determine whether or not relocation would best serve the child. *Id.*

The Tennessee Supreme Court has explained that the parental relocation statute does not provide a brightline rule as to what constitutes "substantially equal time." ***Kawatra v. Kawatra***, 182 S.W.3d 800, 803 (Tenn. 2005) ("Tennessee Code Annotated section 36-6-108 does not define what constitutes 'actually spending substantially equal intervals of time.'"). The ***Kawatra*** court did, however, provide guidance as to how parenting days should be allocated to each parent, noting that parenting time should reflect "time actually spent" with the child. *Id.* at 803 (further noting that the court should consider whether either parent has interfered with the other parent's time with the child). Moreover, the Tennessee Supreme Court has previously explained that the following factors should be considered in determining whether parties spend substantially equal time with their child:

> 1) the hours each parent actually spent with the child on that day; 2) the activities in which each parent engaged with the child; 3) the resources the parent expended on the child's behalf during that time period, including the costs of a meal or any other costs directly related to that parent's care and supervision of the child; and 4) any other factor that the trial court deems relevant.

***Kawatra v. Kawatra***, 182 S.W.3d 800, 804 (Tenn. 2005) (footnote omitted).

"Determining whether parents are spending substantially equal amounts of time with their children is, in the first instance, the trial court's prerogative." ***Collins v. Coode***, No. M2002-02557-COA-R3-CV, 2004 WL 904097, at *3 (Tenn. Ct. App. Apr. 27, 2004). As such, we review the trial court's finding as to this issue for an abuse of discretion. ***Harmon v. Harmon***, No. W2017-02452-COA-R3-CV, 2018 WL 6192233, at *8–*9 (Tenn. Ct. App. Nov. 27, 2018); ***Gensmer v. Gensmer***, No. W2017-00443-COA-R3-CV, 2017 WL 5952918, at *7 (Tenn. Ct. App. Nov. 30, 2017), *perm. app. denied* (Tenn. Mar. 19, 2018) (quoting ***Monroe v. Robinson***, No. M2001-02218-COA-R3-CV,

---

[8] Section 36-6-108 was amended as of July 1, 2018. *See* 2018 Tenn. Laws Pub. Ch. 853 (H.B. 1666). In particular, the statute now provides that the party seeking relocation file a petition to approve the relocation and, if a timely response in opposition is filed, "the court shall determine whether relocation is in the best interest of the minor child." Tenn. Code Ann. § 36-6-108(b), (c)(1) (2018). Thus, it now appears that determining whether the parents are spending substantially equal amounts of time with the child is not necessary. This case, however, was initiated and decided in the trial court prior to the effective date of the statute. *Id.* As such, neither party argues that the statute currently in effect is applicable here. We therefore apply the version of the statute in effect at the time the case was initiated.

- 10 -

2003 WL 132463, at *4 (Tenn. Ct. App. Jan. 16, 2003)). Thus, while the law provides "a framework for determining substantially equal time, there is no concrete boundary." *Harmon*, 2018 WL 6192233, at *7.

As previously discussed, the parties submitted a stipulation during trial regarding the parenting time spent by each parent with the children. Under this stipulation, even awarding Mother all of the disputed days,[9] she spent 56.44% of the time with the children, while Father spent 43.56% of the time in the year immediately preceding the start of the relocation trial. The law is relatively clear that this split constitutes a substantially equal division of parenting time. *See, e.g., Harmon*, 2018 WL 6192233, at *10 (affirming the trial court's finding that a 57%/43% split was substantially equal); *Monroe*, 2003 WL 132463, at *4 (same).

Mother asserts, however, that that trial court abused its discretion in utilizing the year prior to the relocation trial because of the unique circumstances in this case, in particular the lengthy delay between the start of trial and the conclusion of this matter. Respectfully, we cannot agree. In *Kawatra v. Kawatra*, 182 S.W.3d 800 (Tenn. 2005), the Tennessee Supreme Court held that "when circumstances permit, the comparison period should be the twelve consecutive months immediately preceding the relocation hearing." *Id.* at 804. Here, Mother asserts that the circumstances warrant the use of a different period of time because the trial did not take place over a single day, but over a period of more than a year. As such, Mother asserts that the more appropriate period to consider is the time before the trial court's order on the petition, where the parties strictly followed the permanent parenting plan. Under this time frame, Mother contends that she spent over 64% of the time with the children, a division that is not substantially equal. *Kawatra*, 182 S.W.3d at 804 (split of 37.8%-62.2% did not allow the court "to conclude that the parties spent substantially equal intervals of time with the child"); *Heilig v. Heilig*, No. E2014-00586-COA-R3-CV, 2015 WL 3654948, at *6 (Tenn. Ct. App. June 15, 2015) ("trial court correctly concluded that a 60%-40% split between the parents does not amount to 'substantially equal' time under the relocation statute."); *Goddard v. Goddard*, No. E2011-00777-COA-R3-CV, 2012 WL 601183, at *6 (Tenn. Ct. App. Feb. 24, 2012) (noting that a 34.7%-65.3% time split is not substantially equal time); *Redmon v. Redmon*, No. W2013-01017-COA-R3-CV, 2014 WL 1694708, at *4 (Tenn. Ct. App. Apr. 29, 2014) (noting that it was undisputed that the parties did not spend substantially equal time with the child where the time split was 30%-70%).

Here, the trial court specifically found that "the circumstances in the case at bar readily permit the Court, within the confines of the parties' Stipulation, to account for the number of days the parents have exercised with the children in the twelve (12) months

---

[9] The trial court did not award all disputed days to Mother, but instead made detailed findings as to each disputed day. We need not address which days of the disputed days should have been awarded to Mother, however, because even awarding all days to Mother, the division of parenting time is still substantially equal.

immediately preceding the relocation hearing" consistent with the preference expressed in *Kawatra*. We cannot conclude that the trial court abused its discretion in choosing to follow the time period set forth by the Tennessee Supreme Court. *See, e.g., Harmon*, 2018 WL 6192233, at \*9 (reiterating that a trial court's finding of substantially equal time is subject to the abuse of discretion standard). Mother admitted in her pleadings and testimony that the parties generally freely exchanged the children prior to the filing of the petition in opposition to relocation. It was only once the petition was filed that the parties began to adhere more closely to the parenting schedule. As such, a time period that takes into account the schedule utilized by the parties before being significantly altered by the existence of the opposition petition provides more guidance to the trial court as to how the parties were actually parenting without the specter of this dispute. Indeed, the parties' stipulation shows that this time frame involved a small reduction from the parenting time that Father had previously enjoyed with the children, perhaps a reflection of Mother's efforts to reduce Father's parenting time for purposes of this relocation dispute.[10] As such, the time period utilized by the trial court is not only permitted by the circumstances, but appropriate. *See Kawatra*, 182 S.W.3d 800, 804. In other cases involving a lengthy delay between the filing of the petition in opposition and the hearing, this court has still utilized the period of time set forth in *Kawatra*. *See Gensmer v. Gensmer*, No. W2017-00443-COA-R3-CV, 2017 WL 5952918, at \*6 (Tenn. Ct. App. Nov. 30, 2017), *perm. app. denied* (Tenn. Mar. 19, 2018) (noting that this Court is not free to depart from the Tennessee Supreme Court's holding in *Kawatra* that the comparison period be the year prior to "the start of trial"). The trial court therefore did not abuse its discretion in utilizing the year preceding the first hearing date to analyze the issue of substantially equal time.

Mother next appears to assert that the trial court erred in finding that she spent only 56.44% of the time with the children during the relevant timeframe because the trial court did not properly consider the factors set forth by the Tennessee Supreme Court in *Kawatra*. 182 S.W.3d at 804. In particular, Mother notes that the residential parenting schedule undisputedly provides her with more time with the children and asserts that the time she spent with the children was more "intensive[]" than that spent with Father. We disagree with Mother on two counts. First, the trial court's order indicates that it specifically considered the factors contained in *Kawatra* and nevertheless concluded that the parties were spending substantially equal time with the children. Moreover, Mother's argument ignores the fact that she voluntarily entered into a stipulation with Father to determine how the days of that period should be allocated to each parent. In that twelve month period, only eleven days were actually disputed by the parties. The trial court explicitly accepted the stipulation of the parties and no party has raised an issue on appeal that the stipulation was in some way invalid. *Cf. Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 701 (Tenn. Ct. App. 1999) ("Although the parties may not stipulate to questions of

---

[10] The stipulation shows that Mother enjoyed, at most, only 54.52% of the time with the children during the year prior to the filing of the petition.

law, stipulations within the range of possibly true facts and valid legal strategies are allowed.") (internal citation omitted). Thus, the trial court only needed to consider the *Kawatra* factors with regard to the eleven disputed days, as the parties previously agreed to the proper allocation of the remainder of the days. Even giving Mother all of the disputed days, however, the allocation of parenting time was substantially equal. *See Harmon*, 2018 WL 6192233, at *10; *Monroe*, 2003 WL 132463, at *4. As such, the trial court did not abuse its discretion in finding that the parties exercised substantially equal time with the children under section 36-6-108(c).[11]

## II.

Upon a finding that parents are spending substantially equal intervals of time with their child, the trial court must then consider whether the proposed relocation is in the child's best interest. Tenn. Code Ann. § 36-6-108(c) ("If the parents are actually spending substantially equal intervals of time with the child and the relocating parent seeks to move with the child . . . [t]he court shall determine whether or not to permit relocation of the child based upon the best interests of the child."). As previously discussed the trial court's findings on this issue, particularly those resting on credibility, are entitled to deference on appeal. *See Crabtree*, 337 S.W.3d at 811; *Johnson*, 165 S.W.3d at 645. The trial court in this case made very strong credibility findings against Mother, which we will defer to on appeal absent clear and convincing evidence to the contrary.

Under the statute applicable to this case, the court was directed to consider the following factors:

> (1) The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child; . . . .
>
> (2) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or

---

[11] We therefore pretermit Mother's second issue of whether Father failed to show that that Mother's proposed relocation did not have a reasonable purpose, that it was vindictive in that it was intended to defeat or deter Father's parenting time, or that it posed a threat of specific or serious harm.

any caregiver denying parenting time to either parent in violation of a court order;

(3) Refusal to attend a court ordered parent education seminar may be considered by the court as a lack of good faith effort in these proceedings;

(4) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

(5) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(6) The love, affection, and emotional ties existing between each parent and the child;

(7) The emotional needs and developmental level of the child;

(8) The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child. The court may order an examination of a party under Rule 35 of the Tennessee Rules of Civil Procedure and, if necessary for the conduct of the proceedings, order the disclosure of confidential mental health information of a party under § 33-3-105(3). The court order required by § 33-3-105(3) must contain a qualified protective order that limits the dissemination of confidential protected mental health information to the purpose of the litigation pending before the court and provides for the return or destruction of the confidential protected mental health information at the conclusion of the proceedings;

(9) The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(10) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(11) Evidence of physical or emotional abuse to the child, to the other parent or to any other person. The court shall, where appropriate, refer any issues of abuse to juvenile court for further proceedings;

(12) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(13) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight than those of younger children;

(14) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

(15) Any other factors deemed relevant by the court.

Tenn. Code Ann. § 36-6-106(a). We will consider each factor in the order chosen by the trial court.

With regard to the first factor, addressing the nature of each parent's relationship with the child and the extent to which one parent has been the child's primary caregiver, Tenn. Code Ann. § 36-6-106(a)(1), the trial court considered each child independently. In short, the trial court found that this factor weighed "lightly" in favor of permitting the relocation with regard to Audrey, while this factor did not weigh in favor of relocation for Thomas. Mother disagrees with the trial court's findings on this factor, arguing that the trial court essentially ignored the multitude of testimony that Mother "structur[ed] the children's entire lives." We agree with the trial court that the children have a loving and stable relationship with both parents and that relocation threatens Father's relationship with the children, Thomas in particular. In a prior case, however, we reversed the trial court with regard to this factor where the evidence showed that the "[m]other has unquestionably been the primary caregiver for most of the child's life." *Harmon v. Harmon*, No. W2017-02452-COA-R3-CV, 2018 WL 6192233, at *12 (Tenn. Ct. App. Nov. 27, 2018). Like in *Harmon*, this parenting arrangement appears to have been generally agreed to, or at least acquiesced in by Father. In that situation, we concluded that this factor favored the mother. *Id.* In this case, we therefore agree with Mother that this factor favors her with regard to both children.

The second best interest factor primarily asks us to consider whether each parent is willing and able to "facilitate and encourage" a close relationship with the other parent. Tenn. Code Ann. § 36-6-106(a)(2). Here, the trial court found that neither party had a history of denying the parent time with the children; rather, the trial court found that both parties were willing to allow the other parent time with the children as permitted by the parties' schedules. The trial court noted, however, that Father violated the parties parenting plan by using tobacco in the children's presence while Mother had adopted a "scorched earth policy" against Father after the filing of the opposition petition. The trial

- 15 -

court noted that it frowned on both parties' conduct, but did not believe that such conduct indicated that the parties would not facilitate a close relationship with the other parent. As such, the trial court ruled that this factor weighed equally.

Mother contends that the trial court erred with regard to this factor because her history of accommodating Father was used against her in other aspects of this case. We cannot agree that this factor favors Mother. It is true that Mother and Father worked well together prior to the dispute at issue in this case. However, we are somewhat perplexed as to the trial court's finding as to this factor, given that the trial court had previously ruled that Mother's involvement with the June 14, 2013 video caused the trial court to not only question Mother's credibility but also question her willingness to maintain a relationship with Father. [12] Still, Father does not assert that the trial court erred in finding that this factor weighed equally. As such, this finding is affirmed.

---

[12] The trial court made very strong findings regarding this recording:

> The Mother additionally testified that Thomas was holding the cell phone the entire time. Thomas, on the other hand, testified that his Mother was the one holding the cell phone. In fact, the Mother later admitted on cross-examination that you could actually see her finger in the video that Thomas was recording. The Mother also testified originally, under oath, that she did not listen or watch the video, but that she had just pressed send to send the video to the Father. The Court finds on cross-examination, however, that the Mother was involved in the recording of this video by holding the cell phone. The Court further finds that she was close enough to Thomas to hear what Thomas said as she was in fact holding the cell phone contrary to her earlier, sworn testimony.
> This is but one incident that the Court believes that much of the Mother's testimony was self-serving at best, perjurious at worst. The Court will find that it was appalled by the testimony of the Mother regarding this recording. The Mother was untruthful regarding her testimony about how the recording came about. Additionally, the Court finds that it does not believe the Mother's testimony when she states that she will maintain a relationship between the children and their father. It is her actions during this lawsuit that have caused the Court to make this finding. The Court is not only concerned about how the video was made involving Thomas, but the Court is also concerned about the unproven allegations [against Father], the tone of the text messages that were sent by her when she learned of the Father's opposition to relocation, and the fact that she has accused the Father of possessing [inappropriate material] as recently as in her trial brief. This allegation was false. The Court finds that once the Father filed his petition in opposition, the Mother conducted a "scorched earth" policy against the Father. The Court believes that much of the Mother's testimony is in violation of the oath she took prior to her testimony. The Court further finds that because this Court believes that the Mother has been untruthful with the Court, the Court will give very little weight to the testimony of the Mother.

Mother has not met her burden to overturn the trial court's credibility finding against her. *See **Crabtree***, 337 S.W.3d at 811.

- 16 -

The third best interest factor, the parent's refusal to attend a court ordered parent education seminar, is inapplicable to the case at bar. Tenn. Code Ann. § 36-6-106(a)(3). Mother takes issue, however, that the fourth factor, "the disposition of each parent to provide the child with food, clothing medical care, education and other necessary care," is neutral. Tenn. Code Ann. § 36-6-106(a)(4). Although Mother concedes that both parents have the means to provide for the children, Mother contends that "Father's history of denying the existence of Thomas's issues at every stage, his lack of cooperation with testing and medications" show that Father cannot be counted on. The trial court did not agree, finding that Father's alleged deficiencies did not detract from the fact that Father has the ability to provide for the children and has been proactive in medical issues concerning the children. As such, the trial court found this factor to weigh equally. The record does show that Father was reluctant to treat Thomas's issues with the vigor and urgency of Mother. Father's reluctance, however, was not altogether unjustified or unreasonable. For example, Father testified that he hoped to pursue behavioral therapy prior to medication for Thomas. As a pharmacist, Father would certainly be aware of the benefits and concerns regarding medication. As such, we cannot conclude that the trial court abused its discretion with regard to this factor.

Subsection five of the best interest provision asks the court to consider the "degree to which a parent has been the primary caregiver." Tenn. Code Ann. § 36-6-106(a)(5). The trial court found that this factor weighs in favor of Mother, but stated that it was not as relevant as in other cases, particularly those involving initial custody determinations. The record reflects that this factor indeed weighs in favor of Mother, as the evidence generally shows that Mother is far more involved in the children's school, extracurricular activities, and even in simply dressing them appropriately. As such, we must conclude that this factor heavily favors Mother.

Turning to factor six, the trial court concluded that the "love, affection, and emotional ties existing between each parent and the child," favors Father with regard to Thomas and weighed little with regard to Audrey. Tenn. Code Ann. § 36-6-106(a)(6). The totality of Mother's argument on this factor is as follows: "this factors favors neither parent in that they both love their children dearly." The trial court made extensive findings on this factor, particularly with regard to Thomas's emotional ties to Father. Respectfully, Mother's effort to overturn the trial court's finding on this factor is nothing more than skeletal. *See **Sneed v. Bd. of Prof'l Responsibility of Supreme Court***, 301 S.W.3d 603, 615 (Tenn. 2010) ("It is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived."). As such, we decline to disturb the trial court's findings as to this factor.

Jumping to factor eight, the "moral, physical, mental and emotional fitness" of each parent as it relates their ability to parent the child, the trial court found that this

factor weighs in favor of each party equally. Tenn. Code Ann. § 36-6-106(a)(8). The trial court noted that while Mother "continues to peck away at some of Father's missteps, perfection is neither the goal for the [c]ourt nor is perfection ever really possible." Mother agrees that this factor favors neither party, but does not waste the opportunity to ensure that Father's affair with a married woman following the divorce is "noted." We agree with the trial court that perfection is not required and nothing in the record suggests that either party lacks the moral, physical, mental or emotional fitness to parent these children.

The trial court also found no evidence of physical abuse, which is not disputed by the parties. Tenn. Code Ann. § 36-6-106(a)(11). Mother does dispute, however, the trial court's finding as to factor twelve, "[t]he character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child." Tenn. Code Ann. § 36-6-106(a)(12). Here, Mother notes that Step-Mother admitted that she continues to smoke cigarettes and that she suffers from alcoholism, although she is long-sober. Mother also asserts that Step-Mother's sons have bullied Thomas.[13] Again, Mother cites no law to support her position, nor does this portion of her brief contain any citations to the record on appeal. *See Bean v. Bean*, 40 S.W.3d 52, 55 (Tenn. Ct. App. 2000) ("Courts have routinely held that the failure to make appropriate references to the record and to cite relevant authority in the argument section of the brief as required by Rule 27(a)(7) constitutes a waiver of the issue."). Moreover, we are not persuaded by Mother's argument. The evidence shows that Step-Mother has maintained her sobriety for a considerable period of time and is an appropriate figure in the children's lives. Prior to the petition in opposition to relocation, it appears that Mother had no qualms about Step-Mother's or her children's presence in the lives of the children.[14] As such, we agree that this factor favors neither party.

The trial court disregarded factor thirteen involving the preferences of the children and Mother does not dispute this finding on appeal. Tenn. Code Ann. § 36-6-106(a)(13). The trial court further found that factor fourteen, regarding each parent's employment schedule, was not relevant in this case. Tenn. Code Ann. § 36-6-106(a)(14). The trial court essentially stated that this would be considered only with regard to a visitation schedule, rather than a relocation. Respectfully, we disagree. Here, the Tennessee General Assembly has specifically stated the factors that are relevant in a relocation case. Tenn. Code Ann. § 36-6-108(c) (stating that the trial court "shall consider all relevant factors including those factors found in § 36-6-106(a)(1)–(15)"). Among those factors is each parent's employment schedule. Tenn. Code Ann. § 36-6-106(a)(14). While this factor may not be as important as other factors, it is certainly relevant to the

---

[13] The issue of the cigarettes relates to Audrey's allergies. The record shows that Audrey is also allergic to cats and Mother continues to own a cat, choosing instead for Audrey to undergo allergy shots.
[14] The trial court also made some findings as to allegations against Step-Mother's father. Mother does not mention these allegations with regard to this factor, and we therefore will not address them.

consideration. The evidence at trial showed that Mother was the parent who was more available to the children. Further, Mother testified that her employment schedule should she be allowed to relocate would afford her even more time given her part-time employment status. In contrast, the evidence shows that Father worked long hours starting his pharmacy. As such, this factor favors Mother.

The trial court analyzed factors seven, nine, and ten together, as the trial court noted that these factors were particularly important and generally concerned the same facts. *See* Tenn. Code Ann. § 36-6-106(a)(7) (involving the emotional needs and development of the child); Tenn. Code Ann. § 36-6-106(a)(9) (involving the child's interaction with friends and family and involvement in school and activities); Tenn. Code Ann. § 36-6-106(a)(10) (involving the importance of continuity). The trial court first considered these factors with regard to Audrey. The trial court found that her entire support system is in Nashville, including her Father, current school, friends, and extended family. The trial court agreed with Mother's expert that while Audrey could "withstand the relocation to Ohio," the totality of the circumstances weighed against relocation.

The trial court's findings with regard to Thomas were even more extensive. The trial court noted that despite the issues that Thomas faces, he has made significant improvements both academically and socially in his current environment. The trial court expressed concern that a change in Thomas's living and educational situation would have a negative impact on him, largely crediting the testimony of Dr. Freeman. Based on the testimony of Dr. Freeman, the trial court further found that the relationship between Thomas and Father is significant to the child's wellbeing and would be damaged by the relocation. The trial court also found compelling Dr. Freeman's testimony that Thomas's stability is furthered by remaining in Nashville, where his Father, school, friends, and extended family are. The trial court therefore agreed that a move could be difficult for Thomas given the issues he faces.

Finally, the trial court expressed its disagreement with Dr. McMillan's testimony regarding what Mother terms "the primacy of the husband/wife relationship," i.e., that the children's best interests coincides with Mother's interest in maintaining her marriage and that if Mother is happy, that happiness will translate into the happiness of the children. The trial court essentially rejected this testimony, noting that its mandate under section 36-1-108 was not to determine whether it was in the children's best interest to maintain a close relationship with Mother, but whether it is in their best interest to relocate. Under all of the circumstances, the trial court ruled that factors seven, nine, and eleven heavily favored denying Mother's petition to relocate with the children.

As an initial matter, Mother takes issue with the trial court's decision to credit the opinion of Father's expert, Dr. Freeman, over the opinion of Dr. McMillan, the expert that testified on her behalf. It is well-settled that "[w]hen expert testimony differs, it is within the discretion of the trial judge to determine which testimony to accept." ***Bohanan***

*v. City of Knoxville*, 136 S.W.3d 621, 624 (Tenn. 2004) (quoting **Kellerman v. Food Lion, Inc.,** 929 S.W.2d 333, 335 (Tenn. Work. Comp. Panel 1996)). Mother, asserts, however, that this rule should not apply because Dr. McMillan's testimony was presented by deposition. The Tennessee Supreme Court has held that "where the issues involve expert [] testimony and all the [expert] proof is contained in the record by deposition, . . . then this Court may draw its own conclusions about the weight and credibility of that testimony, since we are in the same position as the trial judge." *Id.* (quoting **Krick v. City of Lawrenceburg**, 945 S.W.2d 709, 712 (Tenn. 1997)). Here, the parties do not dispute both Dr. Freeman and Dr. McMillan testified by evidentiary deposition. As such, Mother is correct that we may draw our own inferences as to the expert's testimony.

Mother next contends that the trial court erred in finding that the children's emotional needs and development did not weigh in her favor. *See* Tenn. Code Ann. § 38-1-108(7). In support, Mother notes Father's "somewhat laissez-faire attitude to identifying both their needs and to taking steps to address them." Likewise, Mother argues that trial court should have found factor nine, regarding the child's interactions, favored her, citing the children's positive interactions with their step-siblings in Ohio, the close relationship between the children and Mother's family, and Father's affair with Mother's family member. *See* Tenn. Code Ann. § 38-1-108(9). Finally, Mother argues that continuity is furthered by allowing the children to remain with Mother. Mother also notes that any claim that continuity favors denying relocation is weakened by the fact that the children have traveled extensively to Ohio and Thomas had a positive reaction to his proposed school. *See* Tenn. Code Ann. § 38-1-108(10).

Respectfully, we cannot conclude that the trial court abused its discretion in finding that factors nine and ten generally favor Father in this case. Here, both children's lives are in Nashville, including the bulk of their friends, their schools, and their activities. In addition, Thomas is particularly attached to Father, although the experts tended to disagree as to whether this attachment was healthy, discussed *infra*. Removing Thomas from Father and his current environment is especially troubling given his difficulty in making and maintaining friendships and the improvements he has made in this regard. Thomas's ADHD diagnosis was a central issue in this case. In particular, Mother averred that Father did not take Thomas's issues seriously enough. We therefore simply cannot credit Dr. McMillan's testimony that Thomas's ADHD diagnosis has little relevance to whether the relocation should be allowed. Instead, like the trial court, we conclude that Dr. Freeman's testimony that Thomas's diagnosis makes a move even more difficult than with other children should be credited.

Moreover, the closest family that the children have is in Nashville, albeit that this family is on Mother's side.[15] In a basic change of custody case, continuity is often furthered by maintaining the relationship between the primary caregiver and the children.

---

[15] Mother's family is to be commended for maintaining the relationship with the children despite the difficulties of Father's conduct and this proceeding.

In this case, where the parents were spending substantially equal amounts of time with the children and the primary residential parent seeks to move a significant distance from the children's current home, continuity often weighs against relocation. *See Harmon*, 2018 WL 6192233, at *17 (finding that the continuity factor weighed in favor of father's opposition to relocation where the child's extended family, school, and activities were in Nashville). This is true even of Audrey, who no one disputes would eventually adapt following the relocation. *See id.* ("While it may very well be true that the child would easily adjust to a routine in Chattanooga, uprooting the child from an environment in which she enjoys so much support and so clearly thrives would necessarily have a profound effect on the child."). As such, the trial court did not abuse its discretion in finding that factors nine and ten weigh in favor of Father's petition in opposition of relocation.

Factor seven, regarding the emotional needs of the children, is less clear. Here, the evidence shows that once Thomas's issues became pronounced, Father was reluctant to seek professional help. Although Father's reluctance to place Thomas on medication may have been reasonable given Father's profession as a pharmacist and his knowledge of the drugs at issue, his initial reluctance to seek even testing of Thomas is concerning to this Court. Moreover, it appears that while Father now admits that the testing and treatment of Thomas was justified and has helped him immensely, it should not be ignored that Father refused to participate in the testing initially and still sometimes forgets Thomas's necessary medications. With regard to Audrey, it also appears that Mother is by far her emotional rock.

Not all of the evidence favored Mother, however. Here, the record shows that Mother chose to inform the children of her proposed relocation, and therefore involve the children in the relocation dispute, prior to receiving official permission to relocate. Evidence in the record also shows that Mother may have disregarded Father's wishes in informing the children of the relocation at this early stage. This court has previously considered similar actions on the part of a parent to show that the parent had "very little concern or regard for [f]ather's relationship and parenting time with the child." *Harmon*, 2018 WL 6192233, at *13. The record further shows that Mother has sometimes allowed the children to become too enmeshed in the dispute, illustrated most succinctly in the June 14, 2013 video. Mother's denial of her involvement in this video caused the trial court to find that she lacked credibility.

Moreover, Dr. Freeman testified that Thomas has an extremely close bond with Father that would be harmed by the relocation. Dr. Freeman also testified that relocation could generally cause emotional harm to Thomas, as it removes Thomas from the friends he has had such trouble establishing in Nashville and the beneficial therapist bond with David Thomas. Dr. Freeman also testified that Mother does not always put the children's best interests first, noted by her initial intention to relocate to Ohio regardless of whether

the children were allowed to relocate with her,[16] her decision to marry Step-Father without the children present, and the recording of the June 14, 2013 video, which Dr. Freeman did not believe was unsolicited. Dr. Freeman also testified that relocation could have the effect of increasing parental strife, rather than decreasing it, and that Thomas was concerned by the danger posed by the frequent air travel.

Dr. McMillan agreed that Thomas is strongly bonded with Father, but opined that the attachment was unhealthy and caused by Father's only sporadic attendance in Thomas's life. Moreover, Dr. McMillan generally opined that Thomas's emotional needs were best met by ensuring that Thomas remained primarily with Mother and Mother was able to be with her spouse, as the "[a]dult relationship is the most important relationship in my life and the children come after that[.]" As such, Dr. McMillan testified that it was Mother's prerogative to weigh the costs and benefits of the move. Dr. McMillan also testified that Mother is the better parent of Thomas, as she provides the organization that his diagnosis needs, better responds to Thomas's unique needs, has a closer confidante-style relationship with Thomas, and refrains from criticizing Father's parenting.

As an initial matter, we must consider the scope of this factor and indeed the scope of this best interest determination. As the trial court correctly noted, Tennessee Code Annotated section 36-1-108(c) directs the trial court to consider whether relocation is in the child's best interests. As such, factor seven requires that courts consider the effect the relocation will have on the child's emotional needs and development. Although Dr. McMillan's testimony does include discussion of how the relocation itself will affect the children, for example by decreasing strife between the parties by allowing Mother to generally make all major life decisions for the children, a considerable portion of Dr. McMillan's testimony focuses not on the relocation, but which parent is comparatively more fit to care for the children.

If this was simply a custody matter, we would not take issue with Dr. McMillan's focus; however, this case involves the added layer of how the relocation to Ohio will affect the children. Dr. McMillan sometimes subsumes this issue into the comparative fitness analysis by asserting that what is in the best interests of Mother, i.e., to be with her spouse, is necessarily in the best interest of the children. Here, the question is not what is best for Mother, but what is best for the children. "Child custody and visitation disputes require the courts to focus on the welfare and best interests of the child." *Pizzillo v. Pizzillo*, 884 S.W.2d 749, 755 (Tenn. Ct. App. 1994) (quoting *Lentz v. Lentz*, 717 S.W.2d 876, 877 (Tenn. 1986). While the parents' respective rights and desires "should not be ignored[,]" they are "secondary" in these proceedings. *Id.* (quoting *Doles v. Doles*, 848 S.W.2d 656, 661 (Tenn. Ct. App. 1992)); *but see Caudill v. Foley*, 21 S.W.3d 203, 212 (Tenn. Ct. App. 1999) (stating, in a case unlike this one where the child was not spending substantially equal amounts of time with both parents, "that the best interests of the child are also fundamentally interrelated with the best interests of the parent with

---

[16] Mother later confirmed that she would not move without the children.

- 22 -

whom the child spends the majority of his or her time"). As such, despite Dr. McMillan's belief otherwise, it is not Mother's prerogative to determine whether the move is in the children's best interest; rather, this issue is for the court to decide.

We, like the trial court, find Dr. Freeman's testimony on this issue somewhat more compelling. Dr. McMillan testified that Thomas has severe issues, sometimes likening it to an Autism Spectrum Disorder.[17] Despite his testimony concerning Thomas's significant issues, Dr. McMillan essentially believes that relocation hundreds of miles away is in both Audrey's and Thomas's best interest emotionally because the move will make Mother happy. In contrast, Dr. Freeman testified that the relocation would take the children away from the surroundings where they are most comfortable and would significantly reduce their time with their Father, an important person in both children's lives but particularly for Thomas. Thomas's emotional development is especially benefited by remaining in Nashville, as his close relationship with both his Father and his current therapist can be maintained. As such, we cannot conclude that the trial court abused its discretion in finding that this factor weighs in favor of Father's opposition to relocation, although we must note that it carries little weight with regard to Audrey.

Based on the foregoing, the factors with regard to each parent are generally evenly split, with Mother having three factors in her favor while Father has three factors in his favor. Still, we have previously observed in the relocation context that

> Ascertaining a child's best interests does not call for a rote examination of each of [the statutory factors] and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis.

*Mackey v. Mayfield*, No. E2014-02052-COA-R3-CV, 2015 WL 5882657, at *8 (Tenn. Ct. App. Oct. 8, 2015) (quoting *In re Audrey S.,* 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). In this case, two of the factors that favor Mother stem from her role as the children's primary caregiver. The other factor concerns her employment schedule. The trial court, however, found that these factors did not hold great weight in this case. Instead, the trial court found that the factors concerning continuity and the interactions with the children in their environment were "particularly important."

Although we conclude that the evidence in this case is extremely close, we cannot conclude that the trial court abused its discretion in finding that the children's best interests were not served by the relocation. "A party seeking to have a [trial] court's holding overturned on the basis of abuse of discretion undertakes a heavy burden*.*" *State*

---

[17] Thomas has not been diagnosed with such a disorder.

*ex rel. Jones v. Looper*, 86 S.W.3d 189, 193 (Tenn. Ct. App. 2000). As the Tennessee Supreme Court has explained,

> Under the abuse of discretion standard, a trial court's ruling "will be upheld so long as reasonable minds can disagree as to the propriety of the decision made." A trial court abuses its discretion only when it "applies an incorrect legal standard, or reaches a decision which is against logic or reasoning that causes an injustice to the party complaining." The abuse of discretion standard does not permit the appellate court to substitute its judgment for that of the trial court.

*Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (citations omitted).

The evidence shows that the support system relied on by the children, including their school, activities, and extended family are all in Nashville. In contrast, the support system in Ohio is lacking, as it consists only of Step-Father's family, a relatively new addition to the children's lives. As such, the evidence shows that the relocation would be highly disruptive for the children. The fact that continuity favors Father weighs heavily against Mother's petition to relocate. *Cf. Gorski v. Ragains*, No. 01A01-9710-GS-00597, 1999 WL 511451, at *4 (Tenn. Ct. App. July 21, 1999) ("Drawing from common sense observation, experience, and child development theory, child custody law places a value on continuity and stability in children's lives.").

Of course, such a disruption is evident in nearly all relocation cases. *See id.* at *4–*5 (quoting National Interdisciplinary Colloquium on Child Custody, *Legal and Mental Perspectives on Child Custody Law: A Deskbook for Judges*, § 20:1, at 238 (1998)) ("The notion is that to grow and flourish a child is entitled to and needs the security of a permanent place with permanent ties to a parent figure; moreover, even occasional environmental or familial changes, as well as the threat or fear of such changes, will undermine the child's sense of stability and therefore the child's comfort and security."). If this alone were sufficient to deny relocation, it is possible that relocation would never be allowed. The extent of the disruption is amplified in this case, however, by the unique challenges experienced by one of the children with regard to his emotional and social development.[18] We do not disagree that Mother's desire to live with her spouse and create a healthy home environment is an appropriate desire that takes into account the children's best interest. It is not, however, dispositive of the question of whether the children's best interests support relocation. *See Harmon*, 2018 WL 6192233, at *15 (denying mother's request to relocate even after acknowledging that mother's desire to create a happy and stable family unit with her new spouse "demonstrates an

---

[18] Although these issues are less relevant with regard to Audrey, neither party has suggested in their brief that it would be in either child's best interest to allow one child to relocate while one child remains in Nashville.

- 24 -

understanding of what is positive for the child developmentally"). Mother has not shown that the trial court abused its discretion in finding that the disruption to the children outweighs Mother's desire to reside with her spouse. As such, we cannot conclude that the trial court abused its discretion in finding that relocation was not in the children's best interest.

### III.

The parties next raise issues concerning the trial court's child support calculation, both with regard to the amount of support and the date upon which any change in support was to take place. The initial determination of a child support order is governed by Tennessee Code Annotated section 36-5-101. Tennessee Code Annotated section 36-5-101(e)(1)(A) instructs the trial court to apply the child support guidelines, as set forth in the rules and regulations of the Department of Human Services, as a rebuttable presumption in determining the amount of child support. *See* Tenn. Comp. R. & Regs. § 1240-2-4-.01. Even with the adoption of the child support guidelines, trial courts retain a certain amount of discretion in their decisions regarding child support, which decisions we review under an abuse of discretion standard. ***Richardson v. Spano***, 189 S.W.3d 720, 725 (Tenn. Ct. App. 2005). A trial court abuses its discretion when it has applied an incorrect legal standard or has reached a decision which is against logic or reasoning that caused an injustice to the party complaining. ***Eldridge v. Eldridge***, 42 S.W.3d 82, 85 (Tenn. 2001). We likewise review a trial court's decision with respect to whether a deviation from the child support guidelines is warranted under the abuse of discretion standard. ***In re Chase B.S.***, No. W2011-02334-COA-R3-JV, 2012 WL 5990226, at *8 (Tenn. Ct. App. Nov. 30, 2012). The trial court's discretionary decision to deviate from the child support guidelines must nevertheless "take into consideration the applicable law and the relevant facts." ***Id.*** (citing ***Reeder v. Reeder***, 375 S.W.3d 268, 275 (Tenn. Ct. App. 2012)).

"The fairness of a child support award depends on an accurate determination of both parents' gross income or ability to support." ***Massey v. Casals***, 315 S.W.3d 788, 795 (Tenn. Ct. App. 2009). In most cases, a parent's earning capacity or ability to earn income is equivalent to the parent's gross income. ***Id.*** Accordingly, the trial court was first tasked with determining both Mother's and Father's gross income in order to calculate child support.

### A.

We begin with the trial court's finding regarding Father's income for child support purposes. Here, the trial court entered two orders relevant to this issue. In the first order, the trial court made extensive findings regarding the testimony of Father's income expert, Ronald Williams. Based on this testimony, the trial court ultimately ruled that Father's income totaled $223,441.00, from the following sources: Father's salary of $71,859.00,

Step-Mother's salary of $40,000.00, a loan to shareholder/Father of $110,000.00, and income from Fichtel Properties, LLC in the amount of $1,582.00. The second order merely confirmed these findings, in addition to making some credibility findings in favor of Mr. Williams.[19]

Mother raises two central disputes with the trial court's findings. One, the trial court apparently did not consider Father's bonus. And two, the trial court improperly deducted depreciation from some of Father's income. We begin with the bonus issue. Here, the trial court noted that Father's 2013 tax return stated that Father's income was $442,068.00. The trial court noted Mr. Williams's testimony, however, that a significant portion of this reported income, $370,209.00, was a bonus that was not actually available to Father and therefore did not include this figure in Father's income for child support purposes. The remainder, $71,859.00, represented Father's salary from the pharmacy.

Mother contends that this finding was error and "there was no accounting" for the trial court's decision to remove the bonus from Father's income calculation. On this point, we cannot agree. Here, the trial court made the following findings as to why it did not include this bonus in Father's income:

> Mr. Williams testified that for tax planning purposes the Father was directed to pay out as much income as possible at the end of the year in the form of a bonus in order to avoid paying 6.5 % excise tax to the State of Tennessee.
> However, Mr. Williams stated the business did not have the cash available to pay the bonus because the business is growing and assets are purchased throughout the year.
>
> * * *
>
> Mr. Williams testified after making certain adjustments with certain expenses, he advised the Father to pay himself a bonus of Three Hundred Seventy Thousand Two Hundred Nine Dollars ($370,209.00).
>
> * * *
>
> Mr. Williams testified that after withholding taxes, the Smyrna Pharmacy and Wellness then received a loan due to the shareholder in the amount of Three Hundred Thirty-Five Thousand Two Hundred and Three Dollars ($335,203.00). The Father received One Hundred Dollars ($100.00) from this transaction.

---

[19] Mr. Williams testified by evidentiary deposition. Although we may therefore draw our own conclusions regarding his testimony, we note that Mother presented no competing expert proof on this issue.

Mr. Williams testified that Smyrna Pharmacy and Wellness did not have Three Hundred Seventy Thousand Dollars ($370,000.00) cash at year end, only One Hundred Thousand Seven Hundred Eighty-Eight Dollars ($100,788.00) cash available. The company also had Sixty-Five Thousand Dollars ($65,000.00) in payables at year end that had to be paid in thirty (30) days.

Thus, the trial court's order sufficiently explains why it did not include the bonus in its calculation of income.

Nevertheless, Mother contends that this bonus should have been included as income. Other than correctly stating that bonuses are generally included in income for child support purposes, see Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(1)(v) (including bonuses in gross income), Mother's argument on this count is limited to the following footnote:

> Because the Pharmacy is an S-Corporation, there is a 6-1/2% excise, tax on profits that are left in the business; Mr. Williams would ask his client to pay out as much as possible of the income in the form of a bonus in order to avoid the tax. At the end of 2013, Mr. Williams advised Father that he needed to do a "bonus" of approximately $370,209, withhold enough to satisfy the IRS and loan the balance back to the company. The bonus was actual income to Father; it was profit. Furthermore, as and when the loan back to the company would be repaid to Father, it would not be counted in income nor reported as such. Excluding the bonus from current income would have the effect of permanently removing it from the child support calculation. As it turned out, Mr. Williams underestimated the Pharmacy's earnings by some $53,000; with the result that this amount was left in the company and some excise tax was payable. The money actually left in the company was also actual income to Father.

(record citations omitted). Respectfully, Mother's argument in this case fails in several respects. First, Mother generally does not support her argument with citations to pertinent legal authorities on this issue. *See* **Bean**, 40 S.W.3d at 55; *see also* **Sneed**, 301 S.W.3d at 615 (noting that courts should not construct arguments for litigants). Even more importantly, however, this argument does not show how the trial court abused its discretion in crediting Mr. Williams's testimony that this bonus was not actually useable income to Father, but remained in the business. As Father points out, the Tennessee Supreme Court has specifically held that retained earnings of a corporation do not constitute income of the sole or majority shareholder for child support purposes unless there is "a showing that those retained earnings are excessive or that the income is actually being manipulated." ***Taylor v. Fezell***, 158 S.W.3d 352, 358 (Tenn. 2005).

Mother attempts to include additional argument on this issue in her reply brief, arguing, *inter alia*, that the retained earnings in this case were in fact manipulated by Father's accountant. Reply briefs, however, are generally not a vehicle to correct deficiencies in initial briefs. ***Kanski v. Kanski***, No. M2017-01913-COA-R3-CV, 2018 WL 5435402, at *6 (Tenn. Ct. App. Oct. 29, 2018) (citing ***Ingram v. Ingram***, No. W2017-00640-COA-R3-CV, 2018 WL 2749633, at *11 n.4 (Tenn. Ct. App. June 7, 2018)). Neither retained earnings, manipulation, nor the ***Taylor*** case was mentioned in Mother's initial brief. As such, these arguments are not properly before this Court. Considering the argument properly before this Court, we cannot conclude that Mother met her burden to show that the trial court abused its discretion in excluding this "bonus" or any other retained earnings[20] from Father's income for child support purposes.

Mother next asserts that the trial court abused its discretion in deducting depreciation from Father's income and again notes that the trial court's order provides little guidance on this issue. On this point, we agree. Here, Mother makes the following arguments concerning depreciation:

> Deductions for depreciation made for income tax purposes need to be added back for child support calculations. These entail $19,000 plus further depreciation of $3,008, for total depreciation deductions by Father personally of $22,308. Fichtel Properties, LLC also claimed $6,576 as a depreciation expense, and this amount flowed through as a deduction to Father's income. On top of all that, the LLC claimed a section 179 deduction of $19,972 for accelerated depreciation. The depreciation deductions of $22,308 plus $6,576 plus $19,272 need to be added back to Father's income for child support purposes pursuant to the Tennessee Child Support Guidelines, which exclude depreciation as a deduction.

(Record citations omitted). Mother is correct that the Child Support Guidelines do not allow all forms of depreciation to be deducted from income for child support purposes. Specifically, the Child Support Guidelines state that while reasonable expenses to produce income should be deducted from self-employment income, "[e]xcessive promotional, excessive travel, excessive car expenses or excessive personal expenses, or depreciation on equipment, the cost of operation of home offices, etc., shall not be considered reasonable expenses." Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(3)(ii)(I). The Child Support Guidelines further provide that "[a]mounts allowed by the Internal Revenue Service for accelerated depreciation or investment tax credits shall not be considered reasonable expenses." Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(3)(ii)(II).

---

[20] For example, Mother asserts that there was an additional $34,711.00 in the business that was "not paid in cash to Father but did remain in the business." Based on the foregoing discussion, we cannot conclude that the trial court abused its discretion in deducting this from Father's income.

In his brief, Father asserts that the depreciation was appropriate because it represented "straight line," rather than accelerated depreciation. Father, however, does not support this assertion with any citation to the record for evidence that the depreciation was in fact not accelerated in this case. Indeed, in our review of the evidence, Father's purported "straight line" acceleration is mentioned only once in Mr. Williams's testimony and appears to undermine Father's assertion on appeal:

> Q. Okay. In addition, there is $19,272 in Section 179 expenses that were claimed by the pharmacy -- I'm sorry, claimed by the LLC because it was on Schedule E?
> A. Yes.
> Q. And that is, in fact, accelerated depreciation; isn't that correct?
> A. All depreciation for federal tax purposes is accelerated.
> Q. Well, in theory, you could do straight line depreciation?
> A. I've never seen it done before but, yeah, I guess you could.

Unfortunately, the trial court's findings do little to provide guidance on this issue. Instead, with regard to the depreciation issue, the trial court found as follows:

> Mr. Williams testified that in addition to the payroll and bonus income received by the Father from the Smyrna Pharmacy and Wellness and reflected on his W-2, he also received Thirty-Four Thousand Seven Hundred Eleven Dollars ($34,711.00) of "pass through" income on the K-1 associated with Smyrna Pharmacy and Wellness. This amount includes a reduction of Nineteen Thousand Two Hundred Seventy-Two Dollars ($19,272.00) for depreciation.

> *   *   *

> Mr. Williams testified that Smyrna Pharmacy and Wellness paid Fichtel Property, LLC rent of Twenty-Two Thousand ($22,000.00) for 2015. After allowed expenses, the Father reported One Thousand Five Hundred Eighty-Two Dollars ($1,582.00) of income on his personal return. Part of the expense included Six Thousand Five Hundred Seventy-Six Dollars ($6,576.00) in depreciation for the building.

Thus, nothing in the trial court's findings indicate that it considered the type of depreciation at issue or whether the depreciation should be considered a business expense under Rule and Regulation 1240-02-04-.04(3)(a)(3)(ii)(II).

Pursuant to Rule 52.01 of the Tennessee Rules of Appellate Procedure, trial courts are required to make findings of fact and conclusions of law to support their rulings following bench trials. There is no dispute that the trial court's ruling is detailed and

thorough. It is, in fact, more than sufficient with regard to the other issues in this case. It is not, however, sufficient on this particular issue. An order meets the requirements of Rule 52.01 only when the order "'disclose[s] to the reviewing court the steps by which the trial court reached its ultimate conclusion on each factual issue.'" *Lovlace v. Copley*, 418 S.W.3d 1, 35 (Tenn. 2013) (quoting 9C *Federal Practice and Procedure* § 2579, at 328). Here, it is not certain from the trial court's order whether it considered Rule and Regulation 1240-02-04-.04(3)(a)(3)(ii)(II) regarding accelerated depreciation. We are therefore unable to discern why the trial court deducted the depreciation from Father's income. In this situation, the best practice is to vacate the trial court's ruling and remand for reconsideration of whether depreciation should be deducted from Father's income consistent with the Tennessee Child Support Guidelines. The trial court shall thereafter enter an order fully compliant with Rule 52.01.

Mother also contends that the trial court erred in failing to consider income received by Father from ContinuumRx. Mr. Williams indeed testified that Father received W-2 income from ContinuumRx in the amount of $4,177.00. Neither Father's brief nor the trial court's order specifically addresses this income. In light of our decision to vacate the trial court's determination of Father's income to determine whether depreciation should be deducted pursuant to the Tennessee Child Support Guidelines, we believe it prudent to allow the trial court to address this additional income on remand.

"We recognize that '[e]vents and lives have not stood still while this custody dispute has been in the courts.'" *In re Noah J.*, No. W2014-01778-COA-R3-JV, 2015 WL 1332665, at *6 (Tenn. Ct. App. Mar. 23, 2015) (quoting *Barnes v. Barnes*, No. M2011-01824-COA-R3-CV, 2012 WL 5266382, at *9 (Tenn. Ct. App. Oct. 24, 2012)). In light of the passage of time and the nature of this case, the trial court may, in its discretion, consider additional evidence to ensure that any child support order is based on the parties' actual circumstances. *Kathryne B.F. v. Michael B.*, No. W2013-01757-COA-R3-CV, 2014 WL 992110, at *7 (Tenn. Ct. App. Mar. 13, 2014).

## B.

Father next asserts that Mother's income was miscalculated for purposes of child support. Specifically, Father contends that the trial court erred in finding that Mother was not voluntarily and willfully underemployed. Under the Child Support Guidelines, the trial court may impute income under certain limited circumstances. *See Goodman v. Goodman*, No. W2011-01971-COA-R3-CV, 2012 WL 1605164, at *4 (Tenn. Ct. App. May 7, 2012); *see also* Tenn. Comp. R. & Regs. 1240-2-4-.04(3)(a)(2)(i)(I–III). The *Goodman* Court explained:

> [T]he Guidelines provide that: "[i]mputing additional gross income to a parent is appropriate . . . [i]f a parent has been determined by a tribunal to be willfully and/or voluntarily underemployed or unemployed." Tenn.

Comp. R. & Regs. 1240-2-4-.04(3)(a)(2)(i). However, to trigger this portion of the child support guidelines and "[t]o calculate a child support award based on earning capacity rather than actual net income, there must be a threshold finding that the obligor parent is willfully and voluntarily underemployed or unemployed." *Marcus v. Marcus*, No. 02A01-9611-CV-00286, 1998 WL 29645, at *3 (Tenn. Ct. App. Jan. 28, 1998) (emphasis added); *see also **Kendle v. Kendle***, No. M2010-00757-COA-R3-CV, 2011 WL 1642503, at *3 (Tenn. Ct. App. April 28, 2011) (citing Tenn. Comp. R. & Regs. 1240-2-4-.04(3)(a)(2)(i)(I)).

*Goodman*, 2012 WL 1605164, at *4. The determination of whether a parent is voluntarily underemployed is a question of fact, which "requires careful consideration of all the attendant circumstances." *Richardson v. Spanos*, 189 S.W.3d 720, 726 (Tenn. Ct. App. 2005) (citing *Eldridge v. Eldridge*, 137 S.W.3d 1, 21 (Tenn. Ct. App. 2002); *Willis v. Willis*, 62 S.W.3d 735, 738–39 (Tenn. Ct. App. 2001)). Such a determination "may be based on any intentional choice or act that adversely affects a parent's income." Tenn. Comp. R. & Regs. 1240-2-4-.04(3)(a)(2)(ii)(I). As explained by this Court in *Richardson v. Spanos*, 189 S.W.3d 720, 726 (Tenn. Ct. App. 2005):

When called upon to determine whether a parent is willfully and voluntarily unemployed or underemployed, the courts will consider the factors in Tenn. Comp. R. & Regs. 1240-2-4-.04(3)(d)(2), as well as the reasons for the party's change in employment. *Demers v. Demers*, 149 S.W.3d 61, 69 (Tenn. Ct. App. 2003); *Eldridge v. Eldridge*, 137 S.W.3d 1, 21 (Tenn. Ct. App. 2002). If a parent's reasons for working in a lower paying job are reasonable and in good faith, the court will not find him or her to be willfully and voluntarily underemployed. *Willis v. Willis*, 62 S.W.3d at 738. The courts are particularly interested in whether a parent's change in employment [or amount of income] is voluntary or involuntary, *Eldridge v. Eldridge*, 137 S.W.3d at 21, and are more inclined to find willful and voluntary underemployment when a decision to accept a lower paying job is voluntary. *Demers v. Demers*, 149 S.W.3d at 69.

*Richardson*, 189 S.W.3d at 726. Accordingly, the touchstones for this inquiry are the reasonableness of the employment decision, and whether the choice to take a lower paying job was voluntary. This Court explained:

Our courts will consider the reasonableness of the obligor parent's occupational choices in light of surrounding circumstances. *See Narus v. Narus*, No. 03A01-9804-CV-00126, 1998 WL 959839 at *2 (Tenn. App. Ct. Dec. 31, 1998) (no Tenn. R. App. P. 11 application filed) (obligor not willfully and voluntarily unemployed or underemployed where obligor chose "to retire at a reasonable age, for legitimate reasons, and otherwise

- 31 -

under reasonable circumstances."). The trial court must consider whether the choice to take a lower paying job is made in good faith and whether some or all of the unrealized earning capacity should be included as imputed income.

\* \* \*

Generally, where a reduced actual income is involved, the fact patterns differ on whether the leaving of previous employment or other income producing activity was voluntary, . . .

***Ralston v. Ralston***, No. 01A01-9804-CV-00222, 1999 WL 562719, at \*3 (Tenn. Ct. App. Aug. 3, 1999).

In this case, there is no real dispute that Mother is underemployed, as she left her Nashville employment earning over $800,000.00 per year for employment earning approximately $240,000.00 per year. Mother asserts, however, that this underemployment was not willful as she was forced to leave her Nashville job by her marriage and her belief that Father was going to consent to the move. Mother also contends that the decision to earn a lesser income is reasonable because it allows Mother to spend considerably more time with her children.

The trial court made detailed findings regarding whether Mother was voluntarily underemployed. In relevant part, the trial court found as follows:

It can hardly be disputed that [M]other's decision to leave her previous employment in Nashville was an intentional act. Further, her decision to leave her previous employment has adversely affected her income. The Court will also note that it was probably a mistake on [M]other's part to give her notice of leaving employment before, the parties had resolved the relocation issue.

The Court must decide at this time whether [M]other's choice was reasonable under the circumstances.

The Court must answer this in the affirmative. While [M]other's choice to leave her employment was intentional and has adversely affected her income, the Court cannot find that under the circumstances of this case that her decision is in fact unreasonable.

[M]other has relocated to Columbus, Ohio to reside with her current husband. The Court cannot find that [M]other's choice in wanting to reside with her husband in Columbus, Ohio is unreasonable. Again, perhaps [M]other gave notice of leaving her employment prematurely and potentially made another wrong decision by getting married during the pendency of the case. However, under the circumstances the Court cannot

- 32 -

find that [M]other's ultimate desire to reside with her husband is unreasonable. The Court finds it's completely reasonable for a spouse to want to reside with the other spouse when that, spouse may be prevented from rnoving.to the home city of that spouse.

The [c]ourt finds that, although [M]other's choice to leave her lucrative employment was an intentional choice and it has adversely affected her income, this Court cannot find that [M]other is willfully, voluntarily underemployed.

The trial court is correct that "[n]ot every voluntary employment decision that negatively impacts the parent's income requires a finding of voluntary underemployment[.]" *Thayer v. Thayer*, No. M2015-00194-COA-R3-CV, 2016 WL 4056316, at *5 (Tenn. Ct. App. July 26, 2016). Instead, we have generally declined "to find voluntary underemployment when a parent's decision to work at a lower wage is reasonable and made in good faith." *Id.* (citing *Willis*, 62 S.W.3d at 738). From our review of the argument section of Father's appellate brief, he includes little to no argument to undermine the trial court's explicit finding that Mother's choice to take on lesser employment was reasonable under the circumstances: while Father thoroughly addresses the fact that Mother voluntarily left her extremely high paying employment for significantly less earnings, his argument section simply does not address the trial court's finding that this voluntary choice was nevertheless reasonable under the circumstances.

We have previously held that some of Mother's arguments were waived where they were not supported or merely skeletal. *See Sneed*, 301 S.W.3d at 615. We apply the same standard to Father's arguments. In the absence of any argument to show that the evidence preponderates against the trial court's finding that Mother's voluntary decision to leave her employment was reasonable under the circumstances, we affirm this finding by the trial court.

## C.

Mother next asserts that the trial court erred in not granting a deviation from the presumptive child support amount to take into account private school expenses. The trial court denied Mother's request for a deviation based on the fact that Mother did not timely request a deviation from child support in her pleadings. As the trial court explained,

The Court first learned of the issue in argument by mother's counsel at the hearing on child support and in the mother's post-trial brief filed by her counsel. There is certainly no proof regarding why a deviation would be appropriate under the circumstances of this case.

Therefore, this Court has no choice but to hold that both parties have waived the issue of an upward or downward deviation. The father did not request an upward deviation, nor did the mother request a downward

- 33 -

deviation. There has been no proof as to a need for the deviation or why strict application of the guidelines would be unjust or inappropriate or not in the' best interest of the minor child. The Court will deem the issue of deviation based on extraordinary educational expenses as waived.

Mother does not address the trial court's waiver of this issue in any way in her initial brief; rather, Mother asserts that the trial court's denial of the deviation was a result of the trial court's "mistaken belief that the provision in the parties' parenting plan that Mother would pay for [the tuition] was fixed in contract." Mother is correct that "unlike an agreement to pay college tuition, a parent's agreement to pay for private elementary or secondary education that has been incorporated into a divorce decree is subject to subsequent modification by the trial court." *Ghorashi-Bajestani v. Bajestani*, No. E2016-00063-COA-R3-CV, 2017 WL 809880, at *5 (Tenn. Ct. App. Mar. 1, 2017) (citing *Penland v. Penland*, 521 S.W.2d 222, 224 (Tenn. 1975)). As noted above, however, waiver, rather than contract, was the basis of the trial court's ruling.

Mother again attempts to correct the deficiency in her reply brief, stating that "Mother has indeed asked that the [trial court] award her a deviation for the costs of private school education. Father sought a change of custody in his Petition, which in turn requires a recalculation of child support." Not only is a reply brief an improper vehicle for raising this argument, Mother's argument is itself deficient. Mother's statement includes no record citation, nor citation to any legal authority to suggest that Father's petition to modify the parenting plan necessarily included a request to modify the existing agreement to allow Mother a downward deviation for private school tuition. Simply put, Mother has failed to show that the trial court erred in finding this issue waived.

**D.**

The final child support issue involves Mother's contention that the trial court erred in setting the modified child support obligation to commence on February 1, 2017. Here, the trial court's initial ruling regarding child support was issued on January 13, 2017. "This Court has recognized that in child support modification cases, the 'trial court has the discretion to order the modification effective as of the date of the modification petition, the date of the final hearing, or any appropriate date in between.'" *Huntley v. Huntley*, 61 S.W.3d 329, 339 (Tenn. Ct. App. 2001) (quoting *Bjork v. Bjork*, No. 01A01-9702-CV-00087, 1997 WL 653917, at *8 (Tenn. Ct. App. Oct. 22, 1997) (citations omitted)). In one case, however, the Tennessee Supreme Court held that the trial court did not abuse its discretion "in fixing the effective date of the increase in the child support award as of the date of the judgment[.]" *Gonsalves v. Roberts*, 905 S.W.2d 931, 932 (Tenn. 1995). The trial court did not choose a date between the filing of the petition and the date of the final hearing or at the time the final order was entered. Rather, the trial court chose a date following the final adjudication of the child support dispute and years after the final trial date.

In support, Mother cites this Court's opinion in **In re Drake L.**, No. M2008-002757-COA-R3-JV, 2010 WL 2787829 (Tenn. Ct. App. July 13, 2010). In that case, the Court of Appeals reversed the trial court's failure to award retroactive support to the father, as the father appears to have been receiving no support for a period of time. **Id.** at *9. In reaching this result, we specifically noted that "[t]he trial court made no finding relative to its decision that it was not going to make Mother 'pay any support retroactively' and it did not provide any reason for the decision." **Id.**

The same is not true in this case. After the trial court issued its ruling on the effective date of the child support modification, Father specifically asked the trial court to make more specific findings on the issue of the effective date. The trial court obliged by order of March 8, 2017. Therein, the trial court ruled that

> 1. This matter was a long and complicated case involving 28 days of trial time over a period of over two (2) years.
>
> 2. The length of the time to try this matter and for the Court to prepare its lengthy findings of fact and conclusions of law, 179 pages in total, was due to the complexity of the case, number of issues presented by the parties and the parties themselves.
>
> 3. Although Mother was Primary Residential Parent, her income was much greater than Father's at the time of the entry of the initial child support order, requiring her to pay support to Father. While Mother's income has decreased, she still has the earning capacity of a physician. Father's income has also increased since the initial child support order.
>
> 4. In consideration of all of those factors as well as all of the findings of facts and conclusions of law contained in the orders of the Court entered May 17, 2016 and January 13, 2017, the Court finds that it is right and that equity dictates that February 1, 2017 shall be the commencement date of Father's obligation to pay child support.

Although the trial court's ruling that the effective date of the modification would take place following the issuance of the order setting child support is unusual, we cannot conclude that the trial court abused its discretion. Here, the trial court made detailed findings as to the reason for its decision, which findings took into account the relevant facts and circumstances. As such, there is no abuse of discretion in the trial court's decision to set the effective date of the new child support obligation for February 1, 2017.

## IV.

Finally, the parties dispute the issue of attorney's fees and litigation costs. For her part, Mother asserts that the trial court erred in requiring her to pay Father's significant attorney's fees and discretionary costs incurred in the trial court. In the body of her brief,

Mother also seeks an award of attorney's fees incurred on appeal. Father contends that the trial court correctly awarded him attorney's fees and that he is entitled to additional attorney's fees on appeal. We begin with Mother's argument concerning attorney's fees and discretionary costs awarded at trial.

At the time that this litigation was initiated and decided in the trial court, Tennessee Code Annotated section 36-6-108(i) provided that "[e]ither parent in a parental relocation matter may recover reasonable attorney fees and other litigation expenses from the other parent in the discretion of the court."[21] Pursuant to the plain language of the statute, the trial court's decision to award attorney's fees under this statute is discretionary. *Id.* We therefore review the trial court's decision for an abuse of discretion. *Mackey v. Mayfield*, No. E2014-02052-COA-R3-CV, 2015 WL 5882657, at *9 (Tenn. Ct. App. Oct. 8, 2015).

In this case, the parties entered into two stipulations concerning the fees incurred by Father in the trial court. The first stipulation states that Father's fees incurred in defending against the pornography allegations totaled $19,055.00. The second stipulation states that the hourly fees charged by Father's counsel were reasonable and provides some other rules for calculating the fees. Father submitted an affidavit detailing his attorney's fees pursuant to these stipulations, showing that he incurred a total of $197,160.00 in fees, inclusive of the pornography issues. The trial court awarded Father all of the requested fees.

Mother first disputes the fact that the trial court awarded Father the fees associated with the pornography dispute. Mother contends that implicit in section 36-6-108(i) is that "any such award [of attorney's fees] would relate only to the matters of the relocation" Accordingly, Mother argues that the trial court erred in including fees associated with matters purportedly unrelated to the litigation in its award, as Mother contends that she "announced that she was not pursuing any claim as regard purported pornography on the computer . . . as early as July 2013, and that in any event such purported pornography does not fall within the ambit of the relocation statute."[22]

---

[21] In 2018, the statute was amended and this language was moved to subsection (f). *See* 2018 Tenn.Laws Pub. Ch. 853 (H.B. 1666) (eff. July 1, 2018). There was no substantive change to the attorney's fee provision of the statute.

[22] Mother does not cite to a specific portion of the record where this announcement was made. The record does contain a July 31, 2013 letter indicating that Mother no longer believed that the pornography was placed on the computer by Father, but by another person involved with the family. The pornography issue was clearly not resolved at this time, as Mother later requested that the pornography issue be bifurcated from the relocation trial. Mother also requested an order preventing this person from having access to the computer. Although Mother did eventually dismiss a counter-claim involving the allegations, this dispute remained relevant to the best interest issue, and the parties submitted considerable testimony and evidence on it. Indeed, Mother continued to raise these allegations in her brief, at one point asserting that one claim of pornographic material is "important" to the issues in this case.

Again, however, the trial court made explicit findings with regard to the attorney's fee issue:

> The Court recognizes that the amount of fees and costs requested by [F]ather is significant.
>
> This Court does find that this matter spread over a 28 day period, which required an extraordinary amount of time in labor by the attorneys representing the father. The Court further finds that Mr. Jackson has practiced in the State of Tennessee for an extraordinary long period of time. His experience and reputation certainly command the hourly rate of $400.00 per hour. Ms. Garrett on the other hand, while not practicing as long as Mr. Jackson, has established an excellent reputation in the area of "family law," and has a great amount of experience within the period of time that she has been licensed. Both of these lawyers possess the, skill necessary for trying a case such as the one at bar.
>
> This Court further recognizes that taking a case of this magnitude would naturally preclude at least some employment in other cases. The time commitment both in preparation for trial and the trial itself is extraordinarily high.
>
> The Court will note that both Mr. Jackson and Ms. Garrett were successful in preventing the relocation of the minor children in this matter.
>
> The Court will also reiterate the finding it made in the Memorandum and Order of May 17, 2016 [regarding the explicit credibility finding against Mother and Mother's decision to pursue her accusations regarding the pornography "as recently as in her trial brief"].
>
> The Courts finds that the considerations and factual findings discussed above, along with the difficulty of the case, the length of the trial and the time devoted to this matter, the limitation on taking other business during the pendency of this case, and the "scorched earth" policy taken by the mother against the father, not only warrant, but demand a significant award of attorney fees.
>
> The Court also finds that the mother has a much greater ability to generate income than the father. During the trial the mother actually testified that her income the year before was $850,000.00. While the father makes more money now than at the time of the divorce there is still a major disparity in earning potential. The mother's earning potential is much greater. Therefore, the mother has the ability to pay the requested attorney fees.
>
> The Court finds that the attorney's fees in the amount of $197,160.00 incurred by father's counsel are reasonable and was necessary.
>
> The Court finds that the father has a need for assistance with the payment of his attorney fees. The father's earning capacity is much less than the mothers. Additionally, the father should not have to use his assets

or income to defray the cost of his attorney's fees when he was successful in preventing the relocation.

(Internal citations omitted).

After reviewing the trial court's order, we cannot conclude that the trial court abused its discretion in awarding Father the totality of his attorney's fees. Although Mother's income is set at only $240,000.00 for child support purposes, there is no dispute that she voluntarily, albeit reasonably, left employment earning approximately $850,000.00 per year. This earning capacity far eclipses the earning capacity of Father. Mother points to no evidence presented that she is unable to pay this amount of attorney's fees. Moreover, the trial court specifically found that the issues in this case were complicated by Mother's behavior, particularly in bringing the pornography accusations. Although Mother forcefully asserts that these issues were resolved early on in the case, the record shows that both parties presented considerable testimony at trial concerning this issue. Moreover, this allegation was part and parcel of the relocation matter, as Mother clearly raised this argument, however earnestly, in an effort to undermine Father's petition in opposition. Given the nature of these allegations and the focus of this case on the children's best interests, once these allegations were made, Mother could not simply "'unring the proverbial bell'" and pretend that the allegations had never been made. *Autin v. Goetz*, 524 S.W.3d 617, 637 (Tenn. Ct. App. 2017) (quoting *Dispatch Printing Co. v. Recovery Ltd. P'ship*, 2006-Ohio-1347, ¶ 13, 166 Ohio App.3d 118, 123, 849 N.E.2d 297, 301). Finally, there can be no dispute that Father prevailed in his effort to stop the relocation of the children. On the whole, we cannot conclude that the trial court abused its discretion in awarding Father all of his requested attorney's fees.

We next consider the trial court's award of discretionary costs. Discretionary costs are governed by Rule 54.04 of the Tennessee Rules of Civil Procedure. In addition to the costs included in the bill of costs prepared by the clerk, Rule 54.04 provides as follows regarding the award of additional costs:

> Costs not included in the bill of costs prepared by the clerk are allowable only in the court's discretion. Discretionary costs allowable are: reasonable and necessary court reporter expenses for depositions or trials, reasonable and necessary expert witness fees for depositions (or stipulated reports) and for trials, reasonable and necessary interpreter fees not paid pursuant to Tennessee Supreme Court Rule 42, and guardian ad litem fees; travel expenses are not allowable discretionary costs.

Tenn. R. Civ. P. 54.04(2). As is implicit in its name, the award of discretionary costs under Rule 54.04(2) is discretionary with the trial court and reviewed for an abuse of discretion. *Mitchell v. Jackson Clinic, P.A.*, 420 S.W.3d 1, 12 (Tenn. Ct. App. 2013). As such, "[t]he party seeking to recover discretionary costs bears the burden of demonstrating that it is entitled to recover such costs." *Carpenter v. Klepper*, 205

S.W.3d 474, 490 (Tenn. Ct. App. 2006) (citing **Stalsworth v. Grummons**, 36 S.W.3d 832, 835 (Tenn. Ct. App. 2000)). As we have explained:

> Parties are not entitled to costs under Tennessee Rule of Civil Procedure 54.04(2) simply because they prevail at trial. **Sanders v. Gray**, 989 S.W.2d 343, 345 (Tenn.Ct.App.1998). The particular equities of the case may influence a trial court's decision about these costs. **Perdue v. Green Branch Mining Co.**, 837 S.W.2d 56, 60 (Tenn. 1992); **Stalsworth v. Grummons**, 36 S.W.3d 832, 835 (Tenn. Ct. App. 2000). "However, the courts should, as a general matter, award discretionary costs to a prevailing party if the costs are reasonable and necessary and if the prevailing party has filed a timely and properly supported motion." **Massachusetts Mut. Life Ins. Co.**, 104 S.W.3d at 35 (citing **Scholz v. S.B. Int'l, Inc.**, 40 S.W.3d 78, 85 (Tenn. Ct. App. 2000)).

**Mitchell**, 420 S.W.3d at 12.

In particular, Mother asserts that the trial court erred in awarding fees for creating expert reports as discretionary costs, as these reports are not allowable under Rule 54.04(2). *See* **Halliday v. Halliday**, No. M2011-01892-COA-R3-CV, 2012 WL 7170479, at *13 (Tenn. Ct. App. Dec. 6, 2012) (holding that the trial court abused its discretion in awarding costs related to an unstipulated expert report). Father asserts, however, that this issue is waived because Mother did not object to these fees in the trial court. According to Father, he submitted an affidavit detailing the fees incurred for expert witnesses; the affidavit did not, however, separate allowable deposition time from impermissible report preparation time. The record indeed contains an affidavit filed on October 28, 2016, showing total expert fees of $49,643.25; the affidavit did not, however, contain any information concerning which portion of the fees represented report preparation time. Nothing in the record suggests that Mother objected to the inclusion of report preparation fees in the award of discretionary costs at any point prior to this appeal; indeed Mother's reply brief concedes that she did not object to these expenses, arguing that her action in filing her own motion for discretionary costs "constituted an objection to all the moneys Father requested." Respectfully, we do not agree.

It is well-settled that issues may not be raised for the first time on appeal. *See* **In re M.L.P.**, 281 S.W.3d 387, 394 (Tenn. 2009). This Court has previously held that objections to discretionary costs may be waived in similar circumstances. *See* **Paschall v. Srebnick**, No. M2011-02059-COA-R3-CV, 2012 WL 2054339, at *2 (Tenn. Ct. App. June 7, 2012) ("One purpose of a response to a motion seeking relief of any sort is to advise the movant of the extent to which the motion is opposed. Having failed to put the costs sought by Defendants at issue in their initial response by specifically objecting to either the nature of the costs sought or the manner in which the application was made, Plaintiffs waived any objection to the award."). Given that Mother raised no specific

objection to the costs included in Father's request for discretionary costs, we conclude that an argument to that effect on appeal is waived.

Finally, we address the request for attorney's fees incurred on appeal. As noted above, Father specifically raised this issue in the issues presented section of his brief. Mother, on the other hand, did not; rather, she merely asserted that "[t]he trial court erred in its award of attorney's fees and litigation costs." By not designating this argument as an issue, it is waived. *See, e.g.,* ***In re Samuel P.***, No. W2016-01665-COA-R3-JV, 2018 WL 1046784, at *21 n.13 (Tenn. Ct. App. Feb. 23, 2018) (waiving a request for appellate attorney's fees where the party did not cite any basis for the award or designate the claim as an issue on appeal); ***Naylor v. Naylor***, No. W2016-00038-COA-R3-CV, 2016 WL 3923790, at *4 (Tenn. Ct. App. July 15, 2016) (waiving the request for attorney's fees where it was not designated as an issue); ***Rigsby v. Rigsby***, No. E2014-02095-COA-R3-CV, 2015 WL 7575075, at *7 (Tenn. Ct. App. Nov. 25, 2015) ("Because Mother did not raise the issue of attorney's fees on appeal in her statement of the issues, we determine this issue to be waived.").

We therefore will only address the merits of Father's request for attorney's fees on appeal. This Court has previously held that whether to award attorney's fees incurred on appeal under Tennessee Code Annotated section 36-6-108(i) is within the sole discretion of this Court. ***In re Adelyn B.***, No. W2013-02374-COA-R3-JV, 2014 WL 3698255, at *8 (Tenn. Ct. App. July 24, 2014). Although Father has prevailed on the majority of the issues in this case, the record shows that the parties have been found to be currently earning similar incomes. Moreover, Father was awarded a substantial sum in attorney's fees in the trial court. We therefore exercise our discretion to deny Father's request for attorney's fees incurred in this appeal.

## CONCLUSION

The judgment of the Davidson County Circuit Court is affirmed in part, vacated in part, and remanded to the trial court for further proceedings consistent with this Opinion. Costs of this appeal are taxed to Appellant Jill Crowell Fichtel, for which execution may issue if necessary.

_____
J. STEVEN STAFFORD, JUDGE